**EXHIBIT "B"**
**PROPOSED FIRST AMENDED COMPLAINT**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| IN RE: | |
| Reagor-Dykes Motors, LP, *et al.* | Case No. 18-50214-rlj-11 |
| Debtors. | Jointly Administered |
| Reagor-Dykes Imports, LP, Reagor-Dykes Auto Company, LP and Reagor Dykes Plainview, LP, | |
| *Plaintiffs and Counter-Defendants* | |
| vs. | |
| Vista Bank, | |
| *Counter/Cross Plaintiff* | |
| vs. | Adversary No. 18-050005-rlj |
| Reagor Dykes Motors, LP, Reagor Dykes Amarillo, LP, Reagor Dykes Floydada, LP, Reagor Dykes Snyder, L.P. Reagor Dykes III LLC, Reagor Dykes II LLC Reagor Dykes Auto Mall, Ltd., and Reagor Dykes Auto Mall I LLC, | |
| *Cross-Defendants and Cross Claimants* | |

**PLAINTIFF/COUNTER-DEFENDANTS and CROSS-DEFENDANTS'
FIRST AMENDED COMPLAINT**

In accordance with Rule 7001, *et seq*. of the Federal Rules of Bankruptcy Procedure,

Plaintiffs Reagor-Dykes Imports, LP ("Lmitsu"); Reagor Dykes Auto Company, LP ("RDAC");

and Reagor-Dykes Plainview, LP ("RDT") (collectively "Plaintiffs") and Cross Claimants Reagor

Dykes Motors, LP; Reagor Dykes Amarillo, LP; Reagor Dykes Floydada, LP; Reagor Dykes

Snyder, LP and Reagor Auto Mall, Ltd.; (collectively, "Cross Claimants"), as debtors and debtors-in-possession in the above-styled and captioned cases (the "Bankruptcy Cases"), file this complaint (the "Complaint") to turnover property of the estate, avoid certain obligations and recover certain transfers against Vista Bank (the "Defendant"), to disallow any claims held by Defendant and recover compensatory damages for Defendant's willful violations of the automatic stay. In support of this Complaint, Plaintiffs allege, upon information and belief and subject to proof, the following.

## I.
## NATURE OF THE CASE

1. Debtors file this Amended Complaint against Vista Bank, seeking to recover multiple millions of fraudulent transfers and other transfers avoidable under the United States bankruptcy code. Specifically Debtors pursue recovery against Vista Bank in order to recover monies that may be thereafter by available for distribution for the benefit of the legitimate creditors of the bankruptcy estates.

2. Vista Bank, a creditor in this bankruptcy, has sought to portray itself as a victim of the fraudulent business practices of Debtors' former Chief Financial Officer Shane Smith. But Vista Bank is anything but a victim here, as it benefited from and actively facilitated the fraud that ultimately resulted in Debtors' bankruptcy and the substantial damages suffered by countless creditors.

3. Vista Bank's involvement in this fraud is confirmed by email correspondence between Vista Bank executives and Debtors' former CFO Smith. But even in the absence of any such correspondence, the tens of thousands of banking transactions that Vista Bank processed for Debtors required significant coordination between Vista Bank executives and CFO Smith and provided Vista Bank ample evidence of the colossal, ongoing check kiting fraud. Two simple, objective facts—all known to Vista Bank executives—confirm the point:

2

- In the 12 months prior to filing for bankruptcy (August 2017-July 2018), Debtors made deposits exceeding $1.4 billion into their Vista Bank accounts, ***but***

- Vista Bank was in receipt of Debtors' financial reports, including its 2017 year-end financial reports disclosing only $250 million in gross sales for 2017.

Deposits reflecting an increase of ***almost 600%*** over Debtors' prior year's gross sales could not go unnoticed at Vista Bank, particularly as these deposits were almost ***double*** the entire asset size of Vista Bank.

4.      But it was not the volume or amount of Debtors' deposits (most of which reflected inter-company transactions) that required Vista Bank's complicity.  Rather, it was Vista Bank's active participation in maintaining Debtors' perpetually overdrawn bank accounts that gives rise to Debtors' claims here.  By way of example and during this one-year period leading up to bankruptcy, when Debtors were depositing $1.4 billion into Vista Bank, Debtors' same three Vista Bank accounts were **overdrawn** a combined 368 days.  And yet Vista continued honoring checks and debits against overdrawn accounts and in so doing made the debtors a series of "off the books" loans.  In the two years which preceded the bankruptcy Vista Bank extended millions of dollars in such short-term loans by allowing the Debtors to treat their three checking accounts as revolving lines of credit and thereby allowing CFO Smith's check kiting scheme to continue.

5.      Although the reasons that Vista Bank aided and abetted CFO Smith's fraud are unimportant, as Debtors explain below, the two worked together, each benefiting from the other's misconduct.  Vista Bank President, John D. Steinmetz, personally enriched himself through kick-backs (in the form of roughly $150,000.00 in subsidized luxury car leases for his personal use, funded by Debtors), while at the same time he and Vista Bank at large benefited through the massive bank fees it collected and the prestige of having a "top shelf" customer while pursuing a growth-at-any-cost strategy.  These benefits to Vista Bank and its owners and executives proved ample consideration for merely enabling CFO Smith's continued fraud.

3

6.     Vista Bank's participation in this fraud gives rise to the Debtors' following claims:

(a).   As the result of its knowledge of and participation in Shane Smith's fraudulent schemes, Plaintiffs and Cross Claimants seek to equitably subordinate and disallow the entirety of Vista Bank's liens, claims, causes of action, including any rights to receive a distributions and/or other alleged rights it may have against the estate. Moreover, and pursuant to 11 U.S.C. § 502(d) and (j), this includes Vista's claimed lien against a $2,000,000.00 Certificate of Deposit made the basis of that certain agreed order found at Docket 271of the main case and pursuant to Sections 7 and 9 thereof.

(b).   Plaintiffs seek to avoid and recover from Defendant certain transfers made in violation of sections 549, 550 and 551 of the Bankruptcy Code, including any and all transfers that were made after Plaintiffs commenced the Bankruptcy Cases and which transfers were not authorized by the Bankruptcy Code or this Court.

(c).   Plaintiffs seek to avoid and recover from Defendant certain pre-petition transfers as preferences and pursuant to Section 547, 550, and 551 of the bankruptcy code.

(d).   Cross Claimants seek to avoid and recover certain transfers made in violation of sections 549, 550 and 551 of the Bankruptcy Code. This includes payments made by Cross Claimants in satisfaction of the short-term off-the-books loans extended by Vista Bank to Lmitsu, RDAC and RDT and through true overdrafts to their respective accounts.

## II.
## JURISDICTION AND VENUE

7.     Pursuant to 28 U.S.C. §§ 157 and 1334(b), this Court has subject matter jurisdiction over this adversary proceeding, which arises under title 11, arises in and relates to those certain cases under title 11 currently pending in the United States Bankruptcy Court for the Northern

4

District of Texas, Lubbock Division (the "Court"), captioned In re Reagor-Dykes Motors, LP, et al., Jointly Administered under Case No. 18-50214-11 (RLJ).

8.     The legal predicates for the relief requested in this adversary proceeding are §§ 105, 362, 363, 502, 541, 547, 549, 550 and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 3007, 7001(1), and 7003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Texas (the "**Local Rules**").

9.     This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter final orders for matters contained herein.

10.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1409.

### III.
### PARTIES

11.     Each Plaintiff together with the Cross Claimants are limited partnership formed under the laws of the State of Texas. Each Plaintiff operates at a principal place of business located within the State of Texas. Each Plaintiff is authorized to transact business within the State of Texas. Each Plaintiff currently operates and manages its business as a "debtor-in-possession" pursuant to §§ 1107 and 1108 of the Bankruptcy Code. Plaintiffs are the exclusive entities authorized with standing and capacity, among other things, to prosecute, settle, dismiss, abandon, or otherwise dispose of the assets of the bankruptcy Estates (as defined below) in these Bankruptcy Cases, including, without limitation, the claims and causes of action asserted in this adversary proceeding.

12.     Defendant Vista Bank is a depository banking and lending institution domiciled in the State of Texas. Vista Bank has been served, appeared, and is before this Court for all purposes. By the nature of Plaintiffs' claims against Defendant, the Court has personal jurisdiction over

Defendant in this adversary proceeding. Defendant is named as a party in this action in the proper capacity as a member of the Federal Reserve System registered with the Federal Deposit Insurance Corporation as an insured financial depository institution.

## IV.
## FACTUAL BACKGROUND

13.     The demise of the Reagor Dykes dealerships was both as spectacular as it was catastrophic.  We have long known that the downfall of this once stalwart business was caused, in part, through the financial machinations of its Chief Financial Officer, Shane Andrew Smith. But a troublesome question remains.  How was Smith able to orchestrate a scheme of such magnitude that left a path of financial ruin for so many in its wake?  The answer is that Smith had help from *outside* the dealerships.

14.     The rise of Vista Bank President, John D. Steinmetz, from his days as a junior banker with Plains Capital Bank, to  Lubbock County Republican Party Chair, then as President of Vista Bank and ultimately to successive appointments as a member of the Board of Regents of the Texas Tech University System has been well chronicled.   For a man forty-one years that is quite a resume.  Indeed it is quite a resume for someone of any age.  As was the case with Shane Smith, on the surface, Steinmetz bares all the trappings of an American success story-- right down to the shiny luxury car.  But like Shane Smith, all was not as it seemed to be.

15.     During the tenure of Vista Bank's banking relationship with the Reagor Dykes debtors, the bank's growth was every bit as meteoric as John Steinmetz's career. According to its public filings, from the third quarter of 2016 Vista Bank boasted assets of $398,904,000.00. By the third quarter of 2018, and at the time of the filing of the bankruptcy case, Vista reported an asset size of some $777,449,000.  Vista had nearly ***doubled in size*** over the course of just two years and had only a single small acquisition to explain this rapid growth.  So just how was John

6

Steinmetz able to shepherd his bank to such heights in so short a time? The answer is that- at least in the case of Shane Smith and his financial schemes- Vista Bank was willing to do things that other banks would not. At all relevant times, Vista Bank and Steinmetz knew what Shane Smith was doing. Moreover, and as explained below, they took affirmative acts to assist and help Smith in the scheme.

16. **A. Shane Smith's "Side Deal" With Steinmetz**: Vista's relationship with Smith must be viewed through the prism of Smith's relationship with Vista Bank President and CEO John Steinmetz. To this end, Vista's participation in Smith's schemes cannot be ascribed solely to blind ambition; the pursuit of a growth-at-any-costs strategy, and; the massive banking fees that it received from certain debtors each month. Although these factors certainly play-in, a crucial element is omitted. Beginning in December 2014 and continuing through the filing of the bankruptcies in July 2018, Smith facilitated an arrangement by which Steinmetz (either directly or under the name of Vista Bank) would receive a series of luxury auto leases for use as his personal vehicles. While Steinmetz (and sometimes Steinmetz on behalf of Vista) would execute the auto lease and agreed to pay the full amount of the monthly payments, Smith and Steinmetz reach a "Side-Deal" whereby the Reagor Dykes dealerships would pay a majority of the lease payments directly to the leasing company.

17. Through this arrangement, Steinmetz, for himself and his family, was able to lease the following vehicles for just 36% of the amount he was otherwise obligated to pay: (i) 2015 Cadillac Escalade; (ii) 2015 Chevrolet Tahoe LTZ; (iii) 2016 BMW 750i Xdrive; (iv) 2016 Infinity XQ80, and; (v) a 2016 Toyota Land Cruiser. In that regard, and from December 15, 2014, through the filing of the bankruptcy petition, the Debtors made some **$146,410.02** in direct lease payments to a leasing company and for the benefit of John Steinmetz and against a liability of **$228,150.00**

that Steinmetz would have otherwise been obligated to pay. In other words, the Debtors paid some 64% of the monies John Steinmetz and Vista owed to the leasing company and for the use of luxury vehicles.

18.     A summary of each lease and the number of payments made directly by the Debtors for the benefit of Steinmetz is attached hereto as **Exhibit "A-1"**. In particular it should be noted that Steinmetz obtained additional leases over the summer of 2017. The timing of the 2017 leases were especially suspect, as they occurred in close proximity to the time that Debtors Reagor Dykes Imports, L.P. ("**Lmitsu**"), Reagor Dykes Plainview, LP ("**RDT**") and Reagor Dykes Auto Company, LP ("**RDAC**") received a $3 million dollar unsecured loan from Vista Bank and at a time that its checking accounts were regularly overdrawn by hundreds of thousands of dollars. Suffice it to say, the Leases for the 2016 BMW 750i Xdrive and 2016 Toyota Land Cruiser were executed just one month *before* the $3 million-dollar unsecured loan was approved. The Infinity QX80 was leased by Steinmetz one month *after* the $3 million-dollar unsecured loan was approved.

19.     Under Shane Smith's Side-Deal, Steinmetz knew he was not receiving merely a "generous discount" toward his lease payments. Indeed, he knew that the Debtors- a customer and borrower of Vista Bank- would be making direct cash payments toward his personal lease obligations, together with those of Vista Bank. The direct cash payments by the Debtors were documented in an instrument signed by both Shane Smith and John Steinmetz and entitled "***Substitution of Lease Payments***" and which expressly state who would be paying what. Examples of such instruments that were signed by Steinmetz both in his individual capacity and his capacity as president of Vista Bank are attached herewith as Exhibit "**A-2**".

8

20.     Over the years, the vehicles increased in quality.  In the months which preceded the bankruptcy, Smith and Steinmetz were in active discussions regarding obtaining an Aston Martin (of James Bond fame) for Mr. Steinmetz's use.  The bankruptcy prevented the consummation of this transaction, but presumably it would have been under similar terms as the five other auto leases.

21.     What is not stated in the lease or any other document, however, is what precisely Steinmetz provided to Shane Smith in return for the $146,410.02, in luxury car lease payments that Steinmetz and Vista received from the Debtors. And this is precisely why the transactions between Smith and Steinmetz are so important-- they provide a lens through which view Vista's subsequent conduct.  And Vista's conduct, when viewed from an objective perspective, simply cannot be explained except by the conclusion that it was a participant in Smith's schemes.

22.     **B**. **Vista Is No Victim Under Any Objective Standard**.  Vista, for its part, claims to be a victim of a check kiting scheme in this bankruptcy.  A kite- by definition- is the manipulation of the check clearing system in order to obtain a <u>non-consensual</u> loan from a bank or other financial institution.  But what happens when the manipulation is known to the bank and its officers, and the "loan" obtained by the kite is effectively consensual?  These are not mere esoteric questions but instead, appears precisely what happened in the case of Vista Bank and its customers Lmitsu, RDT, and RDAC.

23.     Lmitsu, RDT, and RDAC had two conventional promissory note-based loans from Vista.   In conjunction with the making of these loans in 2017 and their renewal in Summer of 2018, Vista received financial statements of the dealership which contained, among other things, information regarding the dealerships inventory value and gross revenue.   Vista knew the economic capacity and the historic sales of each of these dealerships.  Moreover Lmitsu, RDT and

9

RDAC each maintained demand deposit accounts with Vista which were essentially business checking accounts.  Vista's computer system also was responsible for generating Lmitsu, RDT and RDAC's monthly bank statements.   Beyond this, Shane Smith was in near constant communication with Lubbock Vista Market President, Toby Cecil, regarding the status of these three checking accounts and particularly when they were overdrawn (which was a frequent occurrence).  A summary of one years' worth of account activity compared with the historic economic performance of the dealerships are contained in tables attached hereto as **Exhibit "B".**

24. *Dealerships Deposited A Staggering & Inexplicable Amount of Money Into Three Vista Checking Accounts*: Lmitsu, RDT and RDAC operated the Lubbock Mitsubishi dealership, and the Plainview Toyota and Ford dealerships respectively.  In the twelve (12) month period preceding the August 2018 petition date, the dealerships deposited over $1.4 billion dollars into just three business checking accounts at Vista Bank.  By comparison with past annual gross sales, this amount is approximately 5.8 times larger than the three dealerships gross sales for 2016 and 5.6 times larger than the gross sales for 2017.  In point of fact, the deposits for virtually every month during this period grossly exceed past average monthly sales, often by several orders of magnitude.  Further, even a cursory review of Vista's own bank statements would reveal that the majority of the deposits took the form of intercompany transfers, that is to say transfers from other Reagor Dykes Dealerships.

25. *Aggregate Size of Deposits Were Significantly Larger Than Vista Bank Itself*: These were not small transactions for Vista Bank that might have otherwise escaped scrutiny. In fact, taken together, these deposits exceeded 180% of the entire asset size of Vista Bank in the third quarter of 2018.  The aggregate deposits in the six-month period preceding the bankruptcy were over 135% of the size of Vista Bank.  These deposits were so large and substantial in nature,

that they would have been discussed by virtually every management level personnel within Vista Bank—water cooler talk as it were. And as established through emails between Smith and Vista Market President Toby Cecil, Vista would often keep its doors open after-hours in order to receive these deposits in a process to be discussed at greater length later in this Complaint and known as "late drawer memo posting."

26.     *Despite the Deposits the Accounts Were Habitually Overdrawn:* Given the sheer sums of money deposited into just Vista Bank accounts, one might make the mistake of assuming that these accounts were flush with cash. To the contrary, and beginning as early as the fall of 2016, the three deposit accounts were regularly overdrawn by millions of dollars. *Intraday* overdrafts- that is to say overdrafts that were cured within the day- were ubiquitous and tended to be the largest in denomination, ranging in the millions of dollars. True Overdrafts- that is an overdraft which persisted for over twenty-four hours – also occurred at an alarming rate but were lesser, though still significant in denomination. Overall, and as evidenced by the table attached Exhibit "B", the three business checking accounts finished the business day overdrawn a combined 368 days out of a 365-day calendar period in the 12-month period preceding the bankruptcy petition.

27.     *The Overdrafts Were Effectively Short-Term Loans Repaid With Intercompany Transfers*: It must be noted that under applicable banking regulation, and as a state chartered bank, Vista Bank was and remains legally obliged to treat True Overdrafts (as distinguished from Intraday Overdrafts) as an extension of credit, or loans. See TEX. FIN. CODE § 31.002(34). Every day, Lmitsu, RDT and RDAC would make large intercompany deposits to endeavor to cure these overdrafts so that a given account would finish the day with a positive balance. In spite of these deposits, these accounts would at times remain overdrawn for days and even weeks at a time. For

11

instance, in the case of Lmitsu, and during a period from May 10, 2018 through May 29, 2018, its checking account remained overdrawn for a period of fourteen (14) consecutive business days or nineteen (19) calendar days.

28.     As a consequence of the regular and persistent overdrafts, Vista Bank permitted Lmitsu, RDAC and RDT to utilize their checking accounts as *sub rosa* and off-the-books line of credits, knowing that that the credit it was extending would be repaid via intercompany transfers. It is unclear whether Cecil or Steinmetz took this proposition to Vista Bank's loan committee or board of directors, as they were required to do under applicable banking law. Nevertheless and on the basis of the conduct of the parties, it is abundantly clear that this is how Vista Bank and the dealerships treated the checking account.  An analysis of the off-the-books short term loans extended by Vista to Lmitsu, RDT and RDAC through their respective checking account is as set forth on **Exhibits "C"** attached hereto.  The data contained therein is compiled from Vista's own bank statements.

29.     Based on the information available to Vista through both the dealership's financial statements and bank statements generated by Vistas own computer system, Vista knew (1) the dealerships were making deposits into its checking account that were far in excess of their revenue generating capacity; (2) that these deposits were largely from other Reagor Dykes entities; (3) that notwithstanding these massive deposits, the checking accounts were regularly overdrawn, sometimes by amounts aggregating in the millions of dollars, and; (4) that notwithstanding all of these facts, Vista elected to permit the dealerships to treat their business checking accounts as *sub rosa* lines of credit.

30.     **C. Vista Was Subjectively Aware of Smith's Schemes**:  In September of 2016, Vista Bank found itself at a precipice.  It was frustrated by the large overdrafts to the dealerships

checking accounts, and was subjectively aware of the risks that it posed to the bank.  In that regard, on September 22, 2016 Toby Cecil wrote an email to Bart Reagor expressing these concerns.  The e-mail is notable for several reasons, the first of which is it appears to be one of only a handful of communications between anyone at Vista Bank and Reagor and regarding the day-to-day business of the dealerships.   To this end, the banking relationship between Vista and the dealerships was almost exclusively handled by Smith and one or two others on his staff.

Cecil's September 22, 2016 e-mail to Reagor provides in part as follows:

"Dear Bart,

We have a situation that we need to address quickly regarding the RD dealership accounts. I have attached the account history for the Mitsubishi account as of close of business yesterday which reflects a negative balance of $1,018,504.03. I know that y'all are in the middle of an audit but this type of activity on your accounts can not continue.

Shane has done a tremendous job of collecting deposits and keeping me abreast of all developments (including multiple phone calls and emails daily) but even with his efforts the account still has a negative balance of close to $200K and this does not include the other overdrawn accounts.

We truly value this relationship **but when a customer has multiple accounts that are at the top of the overdrawn list, it is very difficult to continue to extend credit to a custome**r."

*See* Exhibit "D" (emphasis added).  Approximately an hour later, Reagor responded to this e-mail and cc'd Vista Bank President John Steinmetz.  In responding, Reagor was contrite and apologetic for the situation, but made some follow up requests from Cecil.  To this end Reagor stated in part,

"I don't want any red flags ever!!!!!!!! We are doing to good to ever have any red flags! ***Toby please call me personally if there is ever a concern immediately***!!!!!!!! …………

I called Toby and he told me he sent the email to make sure I was in the loop. Going forward we agreed to make sure that we don't ever let this situation develop again."

*See* Exhibit "D" (emphasis added). In the nearly two years that followed between this email and the date of the bankruptcy petition, there is precious little evidence that Cecil, Steinmetz or anyone else at Vista honored Reagor's request to be personally notified of "concerns" or overdrafts. By way of counterpoint, however, Cecil and Shane Smith communicated daily if not weekly regarding account status' and in the face of ever-increasing overdrafts.

31.     Despite Cecil's ostensibly stern warnings to Reagor, the three DDA accounts finished the day with negative balances, a combined 15 business days out of the month of October 2016. Moreover, Vista continued to do business with and extend credit to the dealerships in spite of the fact that there was an ever increasing number of True Overdrafts across the three accounts in each of the successive months up through the filing of the bankruptcy petition.

32.     In March 2017 the dealerships underwent a series of particularly large overdrafts, with the three accounts finishing the day overdrawn a combined 38 business days out of the 31 days calendar month. In an e-mail dated March 17, 2017, and after setting out a plan for making intercompany deposits to cure overdrafts, Smith commented to Cecil that he had "[l]ots of plates spinning." Cecil responded to Smith's email by noting:

**"I don't know how you keep them [the plates] all spinning : )"**

(emphasis added). According to Vista's bank statements, between March 16 and March 17, 2017, the dealerships had deposited at least $1,413,426.00 in intercompany checks to cure overdrafts and largely from Debtors Reagor Auto Mall, LP and Reagor Dykes Amarillo, LP. From these communications together with others like it, it is clear that Vista knew precisely what Shane Smith was doing.

33.     *Vista Bank's Computer System Told Vista What Shane Smith Was Doing*: Upon information and belief, Vista Bank employs a high-end data analytics software published by

14

Banker's Toolbox/Abrigo or a similar vendor (the "**Analytic Software**").  The Analytic Software is said to be so powerful that it can detect a suspected check kite within the first few checks.  Each day the Analytic Software generates a report of all suspected check kiting based on account activity on a bank-wide basis. These kite-reports are dispatched first to a specified bank officer and if not resolved, these reports are taken all the way up the chain of command.  Given the sheer volume of inter-company transactions occurring on daily basis between the Debtors, Vista's Analytic Software would have been lit up like a Christmas tree.  In this way, Vista Bank did business with Shane Smith in spite of the phosphorescent red flags that its own computer system waived in its bankers' faces on a daily basis.

34. *Shane Smith <u>Told</u> Vista Bank Officers What He Was Doing*. Toby Cecil was the bank officer in charge of the dealerships' banking relationship with Vista. In the face of habitual overdrafts, Shane Smith had regular and extensive email conversations regarding these massive overdrafts with Toby Cecil and others with Vista.  In these emails, Smith would preemptively inform Cecil of the nature and extent of the overdrafts, and how he planned on moving money-largely via checks from other Reagor-Dykes entities- to cure the same.  These emails are frequent and are simply too numerous to catalog.  Suffice it to say, this correspondence is largely concurrent with the True Overdrafts which are cataloged in **Exhibit "C"**.

35. **D.   Vista Helped Smith With His Schemes**: *Part 1: The Late Drawer Memo Post:* February 2018 was another period in which the three business checking accounts faced multiple consecutive days of large overdrafts.  Collectively, the three accounts were overdrawn some 26 banking days out of a 28 day calendar month.   On February 6, 2018, the three accounts finished the day some $3,460,608.45 in the red.  Through intercompany deposits, Smith was able

to significantly reduce these overdrafts. But by the close of business on February 12, 2018 the three accounts finished the day overdrawn by an aggregate $1,489,664.12.

36.     Over the course of the day, the dealerships had made at least $2,458,042.00 in intercompany deposits across the three accounts.   These deposits came largely from Debtors Reagor Auto Mall, LP, Reagor Dykes Amarillo, LP, Reagor Dykes Snyder, LP, Reagor Dykes Motors LP and non-debtor D&R Acquisitions, LLC.   Nevertheless, these deposits were still not enough to bring the accounts positive. But what to do?  Frequently, and beginning at least two years prior to the bankruptcy proceeding, the answer concocted by Cecil and Shane Smith was the "late drawer memo post".

37.     At 4:39 p.m. on February 12, 2018, Shane Smith forwarded to Toby Cecil's attention transaction receipts for deposits that Reagor Dykes employee Ashley Dunn had just made with Vista Bank and after the official close of Vista's business day at 4:00 p.m. They reflect some $1,222,757.00 in intercompany deposits and largely from Debtors Reagor Auto Mall, LP, Reagor Dykes Amarillo, LP, Reagor Dykes Snyder, LP, and Reagor Dykes Motors LP.  These deposits reflect a "late drawer memo post," and is within "spitting distance" of the aggregate negative balances of the three accounts at the close of the business day.   While the deposits were actually made on February 12, 2018, because they were not formally credited to the benefit of Lmitsu, RDAC and RDT until the following business day as reflected on Vista's Bank Statements.  But there is a hidden benefit both to Vista and to the dealerships to the after four deposits.

38.     In the context of deposits, a "late drawer memo post" occurs when a check or other item is received for deposit after the ordinary business hours of the banking or financial institution. When the check or other item is received, a teller (or automatic teller) applies a temporary credit memo to the account of the drawer.  The temporary credit memo is later removed, usually by the

close of the following business day and when the check is batch processed through the check clearing system. However, and during the pendency of the duration of the temporary credit memo, the balance of the checking account *will appear* for the purposes of the banks records as greater than it actually is. The net effect of these memo posted deposits to the dealership accounts, meaning these were immediately available funds, but the deposited checks would not clear the corresponding bank until midnight, the next business day, thereby allowing a mini-kite to occur for 32 hours. Vista was effectively helping Smith to manipulate the check clearing process and to the detriment of other creditors of the estate, and the efforts it made to so border on herculean.

39. In order for Vista Bank to process a late drawer memo post, Smith was required to make special arrangements with Toby Cecil or his cohort Jo'Elda Luman. Cecil and Luman would have tellers waiting after hours for a dealership employee to arrive with large intercompany checks to be deposited. Cecil and Luman would instruct the tellers precisely how to apply the memo-posted credits and to which accounts. Towards the end of the scheme there would multiple millions of dollars deposited via late drawer memo post and on weekly if not daily basis.

40. To summarize, Shane Smith would regularly make special arrangements with Toby Cecil and others for: (i) Vista Bank to stay open after hours; (ii) so that increasingly large deposits of intercompany checks could be made; (iii) to give special instructions to Vista Bank's tellers for the after-hours memo posting of these deposits; (iv) all in order to make Lmitsu, RDT and RDAC's account balances appear to others as larger than they actually were. Throughout the two years immediately preceding the bankruptcy, these late drawer memo posts occurred with increasing and alarming frequency both in occurrence and in amount.

41. Toby Cecil knew that he was helping Shane Smith with his schemes. By way of example, on February 12, 2018, and having forwarded to Cecil the receipts of the late drawer

memo posts, Smith thanked Cecil for having made the arrangements to receive the "late drawer memo deposits".  Toby Cecil responded to this email with just one word…**"Teamwork!"** (emphasis added).

42.     *Part 2: Vista Had Advance Knowledge Of FMCC Audits & Helped Shane Sail Through*:   At all relevant times Ford Motor Credit Company ("**FMCC**") was Lmitsu, RDAC and RDT's exclusive floor plan lender- a fact that was well known to Vista Bank and to Toby Cecil.  Also known to the bank and Cecil was the fact that FMCC's floor plan loans required the dealerships to repay the loan amount for each vehicle that was floored within a few business days of each sale.  They knew that when floor plan loan repayments were made, FMCC required the dealerships to use a specialized Electronic Funds Transfer ("**EFT**") system to transfer monies directly from the dealerships accounts.

43.     By way of its receipt of Lmitsu, RDAC and RDT's financial statements, Vista and Toby Cecil generally knew of the sales activity of each of the three dealerships.  As demonstrated by the dealerships' Vista Bank statements, in most months, the EFT transfers to FMCC were far less than the actual sales and certainly only a fraction of the massive deposits being made.  The one exception to this rule was during a month in which FMCC was undertaking a floor plan audit, which occurred on a quarterly basis from 2017 through the filing of the bankruptcies.

44.     The floorplan audits were intended to be made on a "surprise basis" and without notice or warning to the dealerships.  Following the conclusion of the audit, FMCC would provide a list of payoffs that would have to be made to FMCC within seven (7) business days of the conclusion of the audit. The post-audit payoffs were significant in amount, and were generally multiples of the amounts which the dealerships paid to FMCC in a non-audit month.  And even with all of the intercompany deposits that flowed through the accounts, the post-audit payouts

caused a major cash flow problem with the dealerships that frequently resulted in massive overdrafts across the three checking accounts.   All of this was known to Vista and its Lubbock Market President Toby Cecil.   And Vista and Cecil also would have known that the dealerships were frequently making sales of vehicles out of trust.

45.     It has now been well established that Smith had advanced knowledge of when the supposedly "surprise audits" were going to occur.   Smith shared this prior knowledge with Vista Bank who, in turn, assisted Smith in prolonging the scheme.   By way of example and in an email dated September 18, 2017, Smith wrote to Cecil as follows:

> **"We have our audit at the end of the week, so still making some big payoffs next couple of days but hope to keep the balances above $0 or as close as humanly possible."**

(emphasis added). By audit, Smith was referring to a Ford Motor Credit Company Audit that occurred from September 21-22, 2017.

46.     And yet Cecil responded to what was clearly a serious warning from Smith rather apathetically, stating only "**[t]hanks for the heads up**."   Take in mind that in May and June 2017, Vista Bank had loaned Lmitsu, RDT and RDAC some 5 million dollars, 3 million of which was wholly unsecured.   Cecil expressed no concern about the nature or severity of the forthcoming audit or what effect it might have on the creditworthiness of the dealerships.   Neither, for that matter, did Toby Cecil inquire as to where Smith would be getting the money to make the anticipated paydowns.   The latter would seem to have been a particularly pertinent question in so far as the day that Smith sent the email (September 18), the dealership finished the day overdrawn across all three accounts by a collective $464,728.39.

47.     In point of fact, and during the period that the September 2017 FMCC audit transpired, the three business checking accounts finished the business day overdrawn a combined

twelve (12) days out of a five (5) day period. On September 20, 2019, Lmitsu, RDAC and RDT made intercompany deposits into their checking accounts totaling some $2,300,000.00, and in anticipation of the payoffs they would be making the following day. These deposits were largely from Debtors Reagor Auto Mall, LP, Reagor Dykes Amarillo, LP, Reagor Dykes Snyder, LP, and Reagor Dykes Motors LP.

48.     On September 21, 2017, the dealerships deposited a further $2,150,939.00, in intercompany checks, largely from the same debtors as well as non-debtor D&R Acquisitions LLC. Notwithstanding these massive deposits, by the close of business of the first day of the FMCC Audit, the accounts finished the day overdrawn to the tune of $1,187,225.62. On September 22, 2017-the second day of the audit- even larger intercompany deposits were made (aggregating in excess of $3,000,000.00), but the accounts still finished in the red to the $705,400.34. As to outflows during this time, Lmitsu, RDAC and RDT made some $6.2 million in wire transfer payments to Ford Motor Credit Company as the result of this audit.

49.     Some of the money paid to FMCC was through the *sub rosa* short term extensions of credit Vista Bank made to Lmitsu, RDT and RDAC by permitting large overdrafts across their business checking accounts. The balance was from the deposits of large intercompany checks that were used first to repay FMCC and later to repay Vista for the extensions of credit. All of this was known to Cecil, Steinmetz and to others at Vista Bank.

50.     On January 17, 2018, Smith again informed Cecil in advance of the next successive Ford Motor Credit Audit. The notification was in the context of a conversation regarding a charitable event, wherein Smith noted:

> "[W]e will have our friends out from Ford Credit starting tomorrow, so you'll see some bigger payments as usual. We finished out last night with all possible and good amounts. **We will proceed as always**."

(emphasis added). Although Cecil did not immediately respond to the email, a similar result followed. The audit began on January 18, 2018, and concluded the following day. Apparently, the audit results were terrible and the ensuing payment to FMCC were indeed quite a bit larger than normal- approximately $13,100,000.00[1], which sums were due and payable within seven business days of the date of the audit. These monies were paid to FMCC via a series of several electronic funds transfers ("EFTs") over four business days, beginning on January 18, and concluding on January 23, 2018.

51.     Concurrently with these payoffs, Lmitsu, RDAC and RDT's business checking accounts experienced large overdrafts over two interludes which, when aggregated, are as follows:

| | |
|---|---|
| January 18, 2018 | ($2,923,468,39) |
| January 19, 2018 | ($2,308,429.96) |
| January 22, 2018 | ($2,887,676.62) |
| January 23, 2018 | ($1,918,878.82) |
| *And* | |
| January 26,2018 | ($1,213,894.10) |
| January 29, 2018 | ($3,031,736.40) |
| **TOTAL**: | ($14,284,083.89) |

As is evident, Vista Bank permitted Smith to pay FMCC via EFT with monies that the dealerships did not actually have in their accounts. So, either Vista Bank permitted Smith to pay FMCC by what is in essence a series of "hot" EFT transfers[2], or this is further evidence that Lmitsu, RDAC and RDT's business checking accounts were treated by the Bank as revolving lines of credit.

---

[1] The amount of the payments to FMCC is striking as the three dealerships had reported an aggregate $33,833,995.00 of new and used vehicles on hand as of December 31, 2017. *See Exhibit B.* Thus, this payment would have approximated some 38.7% of the reported value of Lmitsu, RDAC and RDT's inventory as of December 31, 2017.

[2] Upon information and belief, to the extent that an EFT transfer requires immediately available funds, it is unlikely that Cecil alone would have had the authority to authorize these transfers from an account which lacked the collected funds necessary to make the transfers. Such authority would have likely had to have come from John Steinmetz directly.

52.     To his credit, and given the order of magnitude of the overdrafts, Cecil did make inquiries with Shane Smith.  In that regard, and on January 18, 2018, Toby Cecil made the following inquiry:

> "Just checking back on the accounts. We have a couple that are more than $2mm now and subsequently raised a few internal flags. Will we have pending deposits to cover these debits?"

Smith gave Cecil several updates throughout the day regarding intercompany deposits that would be made in an effort to cover the intraday overdrafts.  When these deposits proved insufficient, Smith sent the following email to Cecil regarding the status of forthcoming deposits:

> "Making more progress on some more! Might be after 4PM, who should Ashley go see for a memo post? Or should we just bring in drive through?"

(emphasis added).  Cecil promptly agreed to facilitate the late drawer memo post, noting as follows:

> "Thank you sir. We'll let the tellers know to be on the lookout for any deposits and to memo post them."

In this way, Toby Cecil and Vista Bank knowingly assisted Smith with the manipulation of the check clearing process in order to "square" his FMCC audit and make it appear, at least for a time, that Lmitsu, RDAC and RDT's accounts had a certain amount of funds in their accounts when they did not.  And while the accounts nevertheless finished negative that day, it is likely they would have been further in the red were it not for Vista condoning and assisting with such manipulations.  Vista benefited from this conduct as well.  In so far as the Intraday Overdrafts would range in the multiple millions of dollars, by facilitating the late drawer memo posting, they could mitigate the risk of approaching their per-customer regulatory lending limit.

53.     Smith also informed Vista in advance of FMCC's March 20-21 2018 surprise audit. This audit also happened to coincide with a period in which a loan Vista had extended to Reagor

and Dykes individually was up for renewal. In an email exchange dated March 19, 2018, Smith stated:

> "I am going to have some extra deposit today, but they will be closer to 5 pm when here and ready. **Already have the accounts covered but I'd like to go ahead and get these memos posted if possible today? I know it will just be memo post, but I am doing big payoffs this week for Ford Credit so I wanted to try and get a little ahead if that works for you**."

(emphasis added). Once again, Toby Cecil promptly agreed, but noted that this would also be beneficial to the forthcoming loan approval:

> "Yes sir. I'll make sure the tellers now [sic] as well. **We have our board meeting this week so it would be beneficial to have everything as clean as possible."**

Later that evening and in the same e-mail chain, Smith replied to Cecil noting as follows:

> "Ok they got there before 5 and we have receipts but I don't see them memo posted online, which if [sic] fine. We had good deposits today before these to cover everything.
>
> **If they can memo post, it will help the beginning NSF balances out tomorrow morning as the payoffs that will hit are about twice as normal**, but we'll get them covered! **I am going for a perfect audit this time, so I paid a lot off even if they say they are not needed! Clean and mean!**"

(emphasis added). The memo posted deposits were nearly all intercompany checks.

54. Suffice it to say, the audit was not perfect, nor was it clean. In the seven business days which followed the completion of the March 2018 audit, Lmitsu, RDAC and RDT made approximately $9.9 million dollars in EFT payments to FMCC. Between March 20 and March 30 2018, the accounts finished the day overdrawn a combined total of 11 days. Nevertheless, and due to the pre-planned manipulation of the check clearing process by Cecil and Smith, the True Overdrafts were not nearly to the same order of magnitude as was the case with the January audit. Moreover, and during the month of March 2018, there were sum total of $183,239,772.17, in deposits across the three accounts, the majority of which were intercompany checks. And

notwithstanding these deposits, the accounts finished the day overdrawn a combined thirty-one (31) business days out of a thirty-day calendar month.

55.     The above incidents are only examples of this behavior. Vista Bank had advanced knowledge of when FMCC audits were going to occur.  On the basis of the disparity of reported sales and actual EFT Payments to FMCC, Vista also very likely knew that Smith was routinely causing vehicles to be sold out of trust.  Vista and Toby Cecil knowingly assisted Shane Smith with his financial witchery by helping him conjure the monies necessary to repay FMCC that the dealerships did have and through adept used of both the check clearing process and the apparently unlimited revolving line of credit that Vista called a demand deposit account.

56.     *Part 3: Vista Helped Smith Create Additional "Float" With Intercompany Sight-Draft Scheme:*  Among the other ways that Shane Smith used/created "float" to fuel his financial schemes was by creating "sales" of vehicles between the various Reagor Dykes dealerships and using an antiquated form of payment to support the transaction- the sight draft.

57.     A sight draft is a form of documentary draft, not unlike a letter of credit used in international business transactions.  At its heart, it is payment against documents of title.  The drafting process was designed long ago and to facilitate transactions between underlined unrelated buyers and sellers so they could each mitigate the credit and performance risk of the other by allowing their respective banks to act as intermediaries.

58.     In a normal transaction involving a sight draft and between unrelated parties, one dealership would "agree" to purchase a vehicle(s) from a third-party dealership.  The selling dealership, or the "drawer", would deposit the draft together with the certificate of title to the vehicle with its own bank.  The selling dealership's bank would thereafter present the draft together with the certificate of title to the purchasing dealership's bank for payment (the "drawee").  The

draft would contain instructions for payment, usually upon "sight" plus a certain number of days. Usually seven business days.  During this time period, the purchaser's bank would inspect the certificate of title so as to insure its authenticity.  Upon expiration of the time period and assuming the title was good, the purchaser's bank would issue a cashier's check[3] by way of payment on the draft; cause the same to be delivered to the seller's bank, and concurrently deduct an equal amount from the buyer's bank account.  Ostensibly, if the buyer lacked the funds to pay, the buyer's bank would return the draft, together with the documents of title to the seller's bank. When the seller's bank received the cashier's check from the buyer's bank **- and not before-** it would deposit a like amount of money into the seller's bank account.  Suffice it to say, the sheer complication of this process belies its antiquated nature, as it could have just as easily been used to buy and sell herds of cattle between far flung ranches in the 19th century, as it could for the buying and selling of vehicles here.

59.    As noted above, the entire purpose of the documentary sight draft process is to mitigate credit and performance risk between unrelated parties. It serves virtually **NO** purpose in a transaction between related parties, such as the various Reagor Dykes dealerships.  Moreover, the sheer volume of intercompany checks that were already being deposited between the dealerships would seem to moot any need for the use of this process at all.  That is until Shane Smith, Toby Cecil and others at Vista Bank[4] devised a way to deploy a perverted version of the drafting process in order help create additional "float," which served as an unsecured lending facility that benefitted Vista while avoiding Vista's loan underwriting processes and review.

---

[3] The use of the cashier's check is key to understanding the process.  A cashiers' check constitutes immediately available funds, and because it is drawn on the bank instead of the buyer account, the seller does not bear the credit risk of the buyer's insolvency.  It also illustrates why using a sight draft between two related parties serves zero purpose UNLESS it is to create "float" under the perversion of the process implemented by Shane Smith and Vista Bank and as explained below.

[4] The Debtors believe that Smith reached an agreement with at least one other bank on similar terms.

60.     Through their agreement, and once a selling Reagor Dykes dealership had deposited a draft, Vista would give *immediate credit* to the selling dealership. It would transmit the draft to the purchasing Reagor Dykes dealership which, in turn, would have anywhere between seven to fourteen business days to pay on the draft. The "sale" of the vehicle would not officially be consummated until the buying dealership's bank paid the draft. At which time, presumably Smith would cause the floorplan lender to be paid—assuming he paid the floor plan lender at all.[5] In receiving immediate credit for the drafts, Smith was essentially given free money for a period of seven to fourteen business days.

61.     Vista must have been aware of the enormous risks it was undertaking in giving immediate credit on the drafts, as it did impose a backstop. In that regard, it required Lmitsu, RDT, and RDAC to jointly execute an unsecured promissory revolving line of credit note in the amount of $3,000.000 in May of 2017, which was renewed in May of 2018 (the "revolver"). Vista would give immediate credit for any and all drafts deposited by Lmitsu, RDT and RDAC up to the $3,000,000 and until the revolver was paid back down. Vista presumably paid the line back down itself and with the cashier's checks from the purchasing Reagor Dykes dealership's banks. Nevertheless, if the purchasing dealership failed to cause payment to be made, then Lmitsu, RDT and RDAC would still remain liable for the immediate credit previously given on the deposited draft. Moreover, and when the $3,000,000.00 limit was reached, Cecil would promptly shut off the proverbial spigot and refuse to process further intercompany drafts until the line was paid back down.

62.     After a time, Vista gave up all pretense that this process was anything other than a construct to create float when it ceased requiring that the selling dealerships tender original

---

[5] As stated above, Debtors believe that Vista Bank knew that Smith was regularly selling vehicles out of trust.

certificates of title. All-in-all, hundreds of thousands of dollars changed hands between dealerships on a *daily basis* and through this process. Moreover, each day Vista would send Smith a list of both incoming and outgoing drafts, and ask Shane for instructions on when the incoming drafts should be paid. Often Smith's answer was outside the stated time period contained within the language of the draft- a request Vista Bank honored. This sham draft process was utilized with such frequency that it eventually got beyond the capacity of Vista's smaller Plainview, Texas branch. As such, a decision was made by Toby Cecil and Jo'Elda Luman to consolidate the processing of all the Reagor Dykes intercompany drafts at a single location – i.e., Vista Banks' 98th Street Branch in Lubbock.

63.     As set forth above, Vista knew the nature and extent of Shane's fraudulent schemes. Far from stopping them, they took active measures to help Smith carry out his schemes. Nowhere is this assistance more evident that in the "float" created by the sham draft process that Toby Cecil and others helped to implement here. The "sales" were nothing more than the meaningless churning of inventory between dealerships. And the elaborate and antiquated method deployed to pay for these sales was utterly without purpose- save for giving Smith free money to deploy elsewhere.

64.     **E. #Respectthehustle: Steinmetz Seeks Help of Investment Bankers To Help Dealerships Plug The Hole.** As was his practice, on or about May 7, 2018, Shane Smith sent out a quarterly business review for the first quarter of 2018 to all of the Debtor dealerships' bankers including John Steinmetz and Toby Cecil. However, and notwithstanding these obvious signs of impending financial doom, Steinmetz responded to Smith's update via email dated May 8, 2018 and as follows:

"Incredible!! Congrats to the Greatest Auto Group in the World. **#respectthehustle**"

(emphasis added). It goes without saying that Steinmetz was certainly "respecting the hustle" when he received a series of luxury car leases that were heavily subsidized by Smith through direct cash payments from the dealerships.

65. What is curious is Steinmetz's touting of the dealerships as the "Greatest Auto Group in the World" when and during the immediately preceding month of April 2018, Lmitsu, RDAC and RDT had made an aggregate $182,103,066.05 in deposits into Vista Bank- largely in intercompany deposits- but had finished the business day overdrawn a combined total of thirty-seven (37) business days out of a thirty (30) calendar day month. The aggregate deposits were approximately 8.76X the size of the combinws average monthly sales for the immediately preceding calendar year. In fact, on May 1, 2018—just seven days before Steinmetz's e-mail—the three Vista Business checking accounts had finished off the day overdrawn by a combined $1,510,457.57. All of these facts would have been known not to Steinmetz and Smith.

66. Later in the day on May 8, 2018, Steinmetz took it upon himself to forward Smith's quarterly business review to John Roddy, and Co-Head of Financial Services Investment Banking with Raymond James Financial Services, Inc. Apparently, Roddy had previously done work for Vista Bank. With the forward, Steinmetz noted as follows and with regard to the Reagor-Dykes dealerships:

> "**They need capital**- let me know if you have an auto sales group. Wouldn't be surprised if they don't got [sic] public sooner than later. Apparently Group One Auto has tried to buy them a couple of times."

(emphasis added). Roddy responded favorably to this email, indicating interest, carbon copying another Raymond James Financial Services employee named Mark Goodman and directing Steinmetz to his attention. Steinmetz thereafter responded to Roddy, Goodman as well as Shane Smith, and Bart Reagor as follows:

Mark,

Bart Reagor and the entire RDAG is an incredible salesman/story. **There numbers are OFF the chart. I think they almost did a billion dollars in sales last year.**

His goal is to be the largest dealership in the country and I think he could do it with the right amount of capital and time.

I would encourage you to reach out to them.

(emphasis added).

67. These email exchanges are telling. First, it demonstrates that Steinmetz was aware of the giant hole in the Reagor Dykes dealerships' balance sheet. Otherwise, why would he *sua sponte* contact investment bankers in search of capital without first asking his customer's permission? Second, the email exchange shows that Steinmetz was personally aware that the dealerships' numbers were indeed "OFF the chart"- a fact which was undoubtedly troubling to him given his knowledge of the overdrafts together with the massive amount of intercompany transactions between and among the various Reagor Dykes dealerships.

68. Steinmetz's reference to the 2017 sales numbers is equally problematic. In that regard, the in the 2017 year-end financials provided to Vista state that across all eight dealerships (inclusive of the three Vista dealerships) generated some $769,000,000 in sales, and this was clearly the number being referenced in his email to the investment bankers. According to the same financial statements, the three Vista dealerships, Lmitsu, RDT and RDAC, accounted for only 33% of this sales revenue. However, and in the first four (4) calendar months of 2018 alone, these *three* dealerships had deposited some $566,396,228.89 at Vista which number approximates: (a) 2.26X the gross *annual* sales of the same three dealerships for 2017, and (b) roughly 74% of the gross sales for all eight dealerships for 2017. All of this was, of course, known to Steinmetz.

29

69.     ***F. Post-Petition Transfers***: Prior to the Petition Date, one or more of the Plaintiffs maintained the below depository bank accounts with Defendant (the "**Pre-Petition Accounts**").

| Account Number | Account | Account Holder |
|---|---|---|
| xxx3387 | Checking | RDAC |
| xxx6693 | Checking | RDAC |
| xxx3409 | Checking | RDI |
| xxx2788 | Checking | RDP |
| xxx3395 | Checking | RDP |
| xxx2723 | Savings | RDAC |
| xxx9343 | Savings | RDI |
| xxx6842 | Savings | RDP |

70.     As a regular course of Plaintiffs' pre-Petition Date business operations, certain receivables due and payable to one or more of the Plaintiffs were deposited directly into one or more of the Pre-Petition Accounts.

71.     On and after the Petition Date, Plaintiffs established new bank accounts with Prosperity Bank in accordance with the guidelines ("**Guidelines**") established by the United States Trustee's Office ("**US Trustee**") for chapter 11 debtor-in-possession bank accounts (the "**DIP Accounts**"):

| Account Number | Account | Account Holder |
|---|---|---|
| xxxxx1290 | Payroll | RDAC |
| xxxxx1355 | Operating | RDAC |
| xxxxx8134 | Payroll | RDP |

| xxxxx8126 | Operating | RDP |
| xxxxx1436 | Operating | RDI |
| xxxxx1428 | Payroll | RDI |

72. On August 30, 2018, the Court entered its *Third Interim Order (I) Authorizing the Debtor to use Cash Collateral of Ford Motor Credit Company, (II) Granting Adequate Protection for use Thereof, (II) Modifying the Automatic Stay to Allow for the Relief Requested Herein and (IV) Continuing Final Hearing* [Dkt. 192] ("**Cash Collateral Order**").

73. The Cash Collateral Order set forth the full extent to which all of Plaintiffs' cash and cash equivalents received after the Petition Date may be used in connection with Plaintiffs' ordinary course of business operations.

74. On and after the Petition Date, each Plaintiff provided instructions to immediately cease and refrain from any further deposits into their respective Pre-Petition Accounts. Each Plaintiff provided instructions for delivery of all future payments directly into the respective Plaintiff's DIP Accounts. Despite Plaintiffs' instructions, subsequent to the Petition Date, certain third parties continued making payments on the Plaintiffs' receivables via direct deposits into the Pre-Petition Accounts maintained by Defendant.

75. The funds comprising the post-Petition Date deposits, transfers and/or credits maintained by Defendant in the Pre-Petition Accounts ("**Post-Petition Deposits**")[6] are property of Plaintiffs' Bankruptcy Estates under 11 U.S.C. § 541(a).

76. The Post-Petition Deposits do not comply with the terms of the Cash Collateral Order. The Cash Collateral Order does not permit the Post-Petition Deposits to be maintained by

---

[6] As used herein, the defined term of "**Post-Petition Deposits**" means all cash and cash equivalents deposited, transferred and/or credited in the Pre-Petition Accounts on and after the Petition Date, specifically including, without limitation, the specific transfers set forth on **Exhibit E** hereto under the table heading entitled "Post-Petition Deposits.

31

Defendant in the Pre-Petition Accounts. All Post-Petition Deposits must be maintained in the DIP Accounts and used strictly in accordance with the terms of the Cash Collateral Order.

77. The Post-Petition Deposits violate the US Trustee's Guidelines requiring all of the Plaintiffs' post-Petition Date deposits, credits and revenue generated to be held in the DIP Accounts.

78. The Court has not entered any order authorizing the Post-Petition Deposits. As such, the Post-Petition Deposits are not "authorized" by the Court under 11 U.S.C. § 549.

79. The Defendant is currently in possession, custody, dominion and control of the Post-Petition Deposits.

80. The Post-Petition Deposits are avoidable and recoverable as unauthorized post-petition transfers under 11 U.S.C. §§ 549, 550, and 551.

81. As an entity in possession of estate property under 11 U.S.C. § 541, Defendant is required under 11 U.S.C. § 542 to turnover to Plaintiffs all funds comprising the Post-Petition Deposits (as property of the bankruptcy Estates) to the DIP Accounts.

82. As the "transferee" of avoidable and recoverable transfers, Defendant is required under 11 U.S.C. §§ 549, 550 and 551 to return to Plaintiffs (via transfer to Plaintiffs' DIP Accounts) all funds comprising the Post-Petition Deposits.

83. Plaintiffs have demanded that Defendant transfer all funds deposited and/or credited in the Pre-Petition Accounts on and after the Petition Date, including the Post-Petition Deposits, into the DIP Accounts. Defendant has failed and refused, and continues to fail and refuse, to transfer the Post-Petition Deposits to DIP Accounts.

84. Defendant has not released any of the Post-Petition Deposits to Plaintiffs.

85.     Under 11 U.S.C. § 362(a)(3), Defendant has willfully violated the automatic stay by knowingly retaining possession of, and intentionally exercising control over, property of the Plaintiffs' bankruptcy Estates.

86.     Plaintiffs have sustained actual damages as a result of Defendant's willful stay violations. Plaintiffs have not had access to their cash proceeds in Defendant's possession, which has limited Plaintiffs' cash flow since the Petition Date. The diminished use of cash flow has damaged Plaintiffs' ability to maximize business operations during the pendency of these Bankruptcy Cases. Defendant is liable for the actual damages sustained by Plaintiffs arising from Defendant's unlawful control over the Post-Petition Deposits and corresponding restriction of Plaintiffs' post-Petition Date cash flow.

87.     **G.** ***Plaintiffs Pay Non-Debtors Loans***:  On or about March 20, 2017, Vista Bank extended to Bart Reagor and Rick Dykes a $2,000,000.00 line of credit note and known by Vista as Loan No. 73213.  Ostensibly, this indebtedness was a straight line of credit whose sole obligors were Reagor and Dykes in their individual capacities.   Notwithstanding the fact that the line of credit did not revolve.  Like the Plaintiff's checking accounts, Vista Bank elected to treat this as a revolving line of credit.   Moreover, and notwithstanding the fact that Reagor and Dykes were the only individuals liable for this indebtedness.  The Debtor Plaintiffs made principal and interest payments in excess of $770,000.00 towards the balance of this indebtedness.  These transfers should be set aside as fraudulent transfers, and the monies paid to Vista returned to the Plaintiffs.

88.     **H**. ***Cross Claimants Pay Short Term Overdraft Indebtedness***:  Attached herewith as **Exhibit C** is a list of overdrafts of Lmitsu, RDAC and RDT's checking accounts that persisted through two or more business days.  As such, these overdrafts constituted True Overdrafts and were therefore loans and/or extensions of credit under applicable law.  These loans were repaid

by-in large via transfers from the checking accounts of Cross Claimants. Each of these payments should be set aside as fraudulent transfers, and the monies paid by the Cross Claimants returned to their respective bankruptcy estates.

89. ***I. The Certificate of Deposit***: Pursuant to that certain Agreed Order Modifying Automatic Stay and found at Docket 271 in the main case, Plaintiffs reserved all of its rights following the completion of its investigation to seek return of the monies comprising the certificate of deposit which Vista Bank offset. *See paras 6,7 and 9.* For the reasons set forth at greater length in the sections above, it is now apparent that Vista Bank aided and assisted Shane Smith in his fraudulent schemes. As a consequence and pursuant to 11 U.S.C. § 502(d) and (j), there is cause to revisit this order, and these monies should be returned.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>

**(Turnover of Property of the Estate —11 U.S.C. § 542)**

90. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

91. The Post-Petition Deposits represent the cash proceeds of receivables and other property interests owned by Plaintiffs. Plaintiffs' receivables were property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). Plaintiffs' property interests in the credits deposited into the Pre-Petition Accounts are property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). As such, the Post-Petition Deposits are property of the Estates under 11 U.S.C. §§ 541(a)(6), (7).

92. Defendant is in possession, custody and control of the Post-Petition Deposits.

93. Defendant is not authorized to have possession, custody or control of the Post-Petition Deposits.

94.    The Post-Petition Deposits must be used in accordance with the Cash Collateral Order pursuant to 11 U.S.C. § 363 to finance the working capital needs of Plaintiffs' ordinary course of business operations during the pendency of these Bankruptcy Cases.

95.    The Post-Petition Deposits have more than inconsequential value to Plaintiffs' Estates because the amount of the Post-Petition Deposits exceeds $1,320,434.32.  These funds must be used to finance Plaintiffs' administration of the Estates in these Bankruptcy Cases.  Without access to such funds, Plaintiffs will incur unnecessary costs and additional expenses to administer the Estates in these Bankruptcy Cases.

96.    Accordingly, Defendant is required to turnover exclusive physical possession, custody, dominion and control of the Post-Petition Deposits to Plaintiffs via transfer of the Post-Petition Deposits into Plaintiffs' DIP Accounts.

97.    All conditions precedent to the bringing of this action have been performed or have occurred.

## COUNT II

### (Avoidance of Unauthorized Post-Petition Transfers —11 U.S.C. § 549)

98.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

99.    The Post-Petition Deposits represent the cash proceeds of receivables and other property interests owned by Plaintiffs.  Plaintiffs' receivables were property of the Estate pursuant to 11 U.S.C. §§ 541(a)(1), (7). Plaintiffs' property interests in the credits deposited into the Pre-Petition Accounts are property of the Estate pursuant to 11 U.S.C. §§ 541(a)(1), (7). As such, the Post-Petition Deposits are property of the Estate under 11 U.S.C. §§ 541(a)(6), (7).

100.   The Post-Petition Deposits were delivered to the Pre-Petition Accounts maintained by Defendant after the Petition Date.

101.     Defendant is the recipient of the Post-Petition Deposits.

102.     Defendant is currently in possession, custody and control of the Post-Petition Deposits.

103.     Despite demand being made, Defendant refuses to provide Plaintiffs access to the funds comprising the Post-Petition Deposits. Defendant intends to use the Post-Petition Deposits to offset and/or recoup against Defendant's alleged pre-Petition Date claims against Plaintiffs' Estates.

104.     As the direct recipient of the Post-Petition Deposits, Defendant is a "transferee" of the Post-Petition Deposits because the same are transfers from third parties to Defendant's dominion and control.

105.     Defendant's receipt of the Post-Petition Deposits constitutes one or more "transfers" that occurred without Court authorization.

106.     The Court did not authorize Defendant's receipt of the Post-Petition Deposits.

107.     The Post-Petition Deposits held by Defendant in the Pre-Petition Accounts violate the US Trustee's Guidelines.

108.     Defendant's possession and intended use of the Post-Petition Deposits violates the terms of the Court's Cash Collateral Order.

109.     The Post-Petition Deposits must be used strictly in accordance with the terms of the Court's Cash Collateral Order.

110.     Pursuant to the Cash Collateral Order, Plaintiffs must be provided access to the Post-Petition Deposits to finance the working capital needs of Plaintiffs' ordinary course of business operations during the pendency of these Bankruptcy Cases.

111.     As a result of the foregoing, pursuant to 11 U.S.C. § 549(a), Plaintiffs are entitled

36

to judgment (a) avoiding all of the Post-Petition Deposits, (b) directing that each of the Post-Petition Deposits be set aside, and (c) awarding the Plaintiffs such other and further relief that is just and proper.

112.    All conditions precedent to the bringing of this action have been performed or have occurred.

## COUNT III

### (Recovery and Preservation of Avoided Conveyances — 11 U.S.C. §§ 550, 551)

113.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

114.    Plaintiffs are entitled to avoid the Post-Petition Deposits under 11 U.S.C. § 549 (collectively, the "**Avoidable Transfers**").

115.    Defendant was the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

116.    Pursuant to 11 U.S.C. § 550(a), Plaintiffs are entitled to recover from Defendant an amount not less than the total aggregate balance of all the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

117.    Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of Plaintiffs' bankruptcy Estates.

118.    All conditions precedent to the bringing of this action have been performed or have occurred.

## COUNT IV

### (Objection to and Disallowance of all Claims — 11 U.S.C. § 502(d) and (j))

119. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

120. Pursuant to Rule 3007(b) of the Bankruptcy Rules, a party in interest shall not include a demand for relief of a kind specified in Rule 7001 of the Bankruptcy Rules in an objection to the allowance of a claim but may include such objection in an adversary proceeding. Rule 7001(8) specifies that an "adversary proceeding" includes any proceeding to subordinate any claim or interest. Because Plaintiffs' objections to Defendant's claims include a request to equitably subordinate such claims, Plaintiffs' objection to any and all claims of Defendant against Plaintiffs' bankruptcy Estates should be merged into and included within this Adversary Proceeding.

121. Defendant is a transferee of transfers avoidable under section 549 of the Bankruptcy Code, which property is recoverable and preserved under sections 550 and 551 of the Bankruptcy Code.

122. Defendant has not paid the amount of the Avoidable Transfers, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

123. Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant and/or its assignees, against Plaintiffs' bankruptcy Estates must be disallowed until such time as Defendant pays to Plaintiffs an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

124. In addition, Plaintiffs' investigation of the fraud allegations raised in the Ford Litigation is ongoing. Included within Plaintiffs' investigation is the extent of Defendant's involvement in the fraudulent activities alleged by Ford. The extent of Defendant's potential involvement and liability remains undetermined at this time. To the extent Defendant's liability

exceeds the balance of Defendant's claims against Plaintiffs' bankruptcy Estates, Defendant will not hold an enforceable right to payment against the Estates under 11 U.S.C. § 502(d). Without an enforceable right to payment, no debt would exist and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5). Without a "claim" against Plaintiffs, any and all security interests pledged to secure such nonexistent debt will also cease to exist.

125.    Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiffs object to, seek to disallow, and seek to withhold any distributions to Defendant, and seek to prevent Defendant from enforcing any and all portions of Defendant's alleged claims against the Estates, both secured and unsecured, until such time as (i) Plaintiffs' investigation against Defendant is concluded and (ii) Defendant pays to Plaintiffs an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

126.    Pursuant to 11 U.S.C. § 502(j), any and all claims of Defendant and/or its assignee(s) against Plaintiffs' bankruptcy Estates previously allowed, if any, must be reconsidered and disallowed until such time as (i) Plaintiffs' investigation against Defendant is concluded and (ii) Defendant pays to Plaintiffs an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

127.    All conditions precedent to the bringing of this action have been performed or have occurred.

## COUNT V

### (Equitable Subordination of Defendant's Claim(s) Against the Debtors)

128.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

129.    Subject to proof, any claim asserted by Defendant against Plaintiffs' bankruptcy

Estates arises from inequitable conduct, including conduct described in this Complaint, which has resulted in injury to creditors or the conferring of an unfair advantage on Defendant. This inequitable conduct has resulted in hardship to Plaintiffs' bankruptcy Estates and the entire creditor body. Accordingly, pursuant to §§ 510(c)(1) and 105(a), Defendant's claims against Plaintiffs' bankruptcy Estates should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes. In addition, to the extent Defendant claims to have a lien with respect to any transfer it received from a Debtor, such lien should be transferred to the Debtor's estate pursuant to § 510(c)(2) and 105(a).

130. All conditions precedent to the bringing of this action have been performed or have occurred.

## COUNT VI

### (Compensatory Damages for Willful Violation of Automatic Stay)

131. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

132. The Post-Petition Deposits represent the cash proceeds of receivables and other property interests owned by Plaintiffs. Plaintiffs' receivables were property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). Plaintiffs' property interests in the credits deposited into the Pre-Petition Accounts are property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). As such, the Post-Petition Deposits are property of the Estates under 11 U.S.C. §§ 541(a)(6), (7).

133. Plaintiffs have demanded that Defendant transfer all funds deposited, specifically including the Post-Petition Deposits, into the Pre-Petition Accounts on and after the Petition Date into Plaintiffs' DIP Accounts.

134. Defendant has failed and refused, and continues to fail and refuse, to transfer the Post-Petition Deposits to Plaintiffs' DIP Accounts.

135. Defendant has not released any of the Post-Petition Deposits to Plaintiffs.

136. Under 11 U.S.C. § 362(a)(3), Defendant has willfully violated the automatic stay by knowingly retaining possession of, and intentionally exercising control over, property of Plaintiffs' bankruptcy Estates.

137. Plaintiffs have sustained actual damages as a result of Defendant's willful stay violations, including, without limitation, attorneys' fees and costs.

138. Plaintiffs have not had access to their cash proceeds in Defendant's possession, which has damaged Plaintiffs' ability to maximize business operations during the pendency of these Bankruptcy Cases.

139. Defendant is liable to Plaintiffs for compensatory damages arising from Defendant's unlawful control over the Post-Petition Deposits and corresponding restriction of Plaintiffs' post-Petition Date cash flow.

140. All conditions precedent to the bringing of this action have been performed or have occurred.

**COUNT VII**

**(Avoidance of Preferential Transfers – 11 U.S.C. § 547)**

141. Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

142. Defendant extended immediate credit to RDAC, Lmitsu, and RDTany time a sight draft was presented for payment. By doing so, Defendant unlawfully created a short-term credit facility outside of its standard underwriting and credit procedures and practices.

143. At the time of the Transfers, By providing immediate credit to RDAC, Lmitsu,

41

and RDT upon presentment of a sight draft for payment, Defendant had a right to payment on account of an obligation owed to Defendant by the Debtor.

144. RDAC, Lmitsu, and RDT transferred funds to Defendant to pay the obligations (the "Sight Transfers." The Sight Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

145. The Sight Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

146. The Sight Transfers were for, or on account of, antecedent debts owed by the Debtor before the Sight Transfers were made within the meaning of section 547(b)(2).

147. Defendant was a creditor of the Debtor at the time of the Sight Transfers within the meaning of 11 U.S.C. § 101(10)(A).

148. The Debtor was insolvent at all times during the 90 days prior to the Petition Date within the meaning of section 547(b)(3) and (4).

149. Pursuant to section 547(b)(5), the Sight Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Sight Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

150. By reason of the foregoing, the Sight Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b). As a result, the Plaintiff may recover the amount or value of the Sight Transfers from the Defendant pursuant to 11 U.S.C. § 550.

151. Defendant also extended credit to RDAC, Lmitsu, and RDT by allowing "True Overdrafts" that were not intraday overdrafts and that served as short-term loans made outside of Vista's normal loan review or loan committee processes. By doing so, Defendant unlawfully

created a short-term credit facility outside of its standard underwriting and credit procedures and practices.

152. By providing these short-term loans to RDAC, Lmitsu, and RDT, Defendant had a right to payment on account of an obligation owed to Defendant by the Debtor.

153. RDAC, Lmitsu, and RDT transferred funds to Defendant to pay the amounts it owed for True Overdrafts (the "True Overdraft Transfers." The True Overdraft Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

154. The True Overdraft Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

155. The True Overdraft Transfers were for, or on account of, antecedent debts owed by the Debtor before the True Overdraft Transfers were made within the meaning of section 547(b)(2).

156. Defendant was a creditor of the Debtor at the time of the True Overdraft Transfers within the meaning of 11 U.S.C. § 101(10)(A).

157. Pursuant to section 547(b)(5), the True Overdraft Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the True Overdraft Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

158. By reason of the foregoing, the True Overdraft Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b). As a result, the Plaintiff may recover the amount or value of the True Overdraft Transfers from the Defendant pursuant to 11 U.S.C. § 550.

159. In addition to the Sight Transfers and True Overdraft Transfers, Lmitsu, RDAC, and RDT also made other transfers of funds to Defendant to pay various fees owed to Vista as

well as principal and interest on existing an unsecured credit facility during the 90 days before the Petition Date.

160.    In May, June, and July 2018, Lmitsu transferred to Defendant (a) $225,000 in principal on an unsecured credit facility, (b) $44,091.45 in interest on an unsecured credit facility, and (c) $83,320.82 in fees.

161.    In May, June, and July 2018, RDAC transferred to Defendant (a) $115,000 in principal on an unsecured credit facility, (b) $8,671.83 in interest on an unsecured credit facility, and (c) $78,558.95 in fees

162.    In May, June, and July 2018, RDT transferred to Defendant (a) 47,000 in principal on an unsecured credit facility, (b) $21,399.83 in interest on an unsecured credit facility, and (c) $73,682.86 in fees.

163.    The transfers in paragraphs 72, 73, and 74 shall be referred to as "Bank Transfers."

164.    The Bank Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

165.    The Bank Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

166.    The Bank Transfers were for, or on account of, antecedent debts owed by the Debtor before the Bank Transfers were made within the meaning of section 547(b)(2).

167.    Defendant was a creditor of the Debtor at the time of the Bank Transfers within the meaning of 11 U.S.C. § 101(10)(A).

168.    Pursuant to section 547(b)(5), the Bank Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter

7 of the Bankruptcy Code; (ii) the Bank Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

169.    By reason of the foregoing, the Bank Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the Plaintiff may recover the amount or value of the Bank Transfers from the Defendant pursuant to 11 U.S.C. § 550.

## COUNT VIII

### (Recovery of Avoided Transfers—11 U.S.C. § 550)

170.    Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

171.    Plaintiff is entitled to avoid the Transfers, Sight Transfers, True Overdraft Transfers, and Bank Trasnfers, pursuant to section 547(b), any Fraudulent Transfer pursuant to section 544 or 548, and any Post-Petition Transfers pursuant to section 549.

172.    The Transfers, Sight Transfers, True Oversight Transfers, Bank Transfers, any Fraudulent Transfers and any Post-Petition Transfers are collectively referred to herein as "All Avoided Transfers."

173.    Defendant was the initial transferee of the All Avoided Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit All Avoided Transfers were made.

174.    Pursuant to section 550(a), Plaintiff is entitled to recover from Defendant All Avoided Transfers, plus interest thereon to the date of payment and the costs of this action.

## COUNT IX

### (Avoidance, Preservation, and Return of Actual Fraudulent Transfers under—11 U.S.C. § 544, 548(a)(1)(A), 550, and 551)

175.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

176.    During the two years prior to August 1, 2018, each Plaintiff who had a demand

deposit or checking account with Vista routinely and repeatedly carried negative balances on their respective accounts for multiple days at a time. Each such multi-day negative balance constituted an unsecured loan or extension of credit or debt. Deposits made into each Plaintiff's demand deposit or checking accounts that served to pay off such multi-day negative balances were made from the property of a Debtor.

177.   Each such transfer was made with the intent to hinder, delay, or defraud creditors of the Debtor because the transfer was made in connection with and in furtherance of Smith's fraudulent scheme

178.   Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A).

179.   Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

180.   As of the date hereof, Defendant has not returned any such transfer to the Plaintiffs,

181.   The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

182.   As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 550, and 551 and Texas Business and Commerce Code §24.005, Plaintiffs are entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.

183.   As set forth in paragraph 86 above, the checks and transfers from Cross Claimants that were deposited into the Plaintiffs' accounts described in paragraph 86 were also transfers made with the intent to hinder, delay, or defraud creditors of the Debtor because the transfer was made in connection with and in furtherance of Smith's fraudulent scheme

184.   Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A).

46

185. Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

186. As of the date hereof, Defendant has not returned any such transfer to the Cross Claimants.

187. The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

188. As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 550, and 551 and Texas Business and Commerce Code §24.005, Cross Claimants are entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.

## RESERVATION OF RIGHTS

189. During this proceeding, Plaintiffs may learn through discovery or otherwise of additional transfers that were unknown to the Plaintiffs as of the date of this Complaint.

190. Plaintiff intends to avoid and recover all transfers of the Debtors' interest in property and to or for the benefit of the Defendant or any other transferee. Plaintiffs reserve their rights to supplement and amend this Complaint including without limitation, the right to (a) further state/allege/aver information regarding the transfers, (b) seek to recover additional transfers, (c) modify or revise the Defendant, (d) allege additional causes of action arising under Chapter 5 of the Bankruptcy Code that may become known to Plaintiffs at any time during this proceeding through discovery or otherwise, and for all such amendments to relate back to the original complaint.

191. If Defendant has filed a proof of claim or have a claim listed on the Debtor's schedules as undisputed, liquidated, and not contingent, or have requested or may otherwise

request payment from the Debtors, this Complaint is not intended to be, nor should it be construed as, a waiver of any Plaintiff's right to object to such Claims for any reason, including, without limitation, 11 U.S.C. §502; and all such rights are expressly reserved.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs ask the Court to grant them all of the relief requested in this First Amended Complaint. Plaintiffs further requests all other relief to which it may be justly entitled.

Respectfully submitted,

/s/
Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER, LLP
P.O. Box 98433 (Mail)
Lubbock, Texas 79499
4825 50th St., Ste A
Lubbock, Texas 79408
Tel: (806) 793-1906
Fax: (806) 792-2135
aseger@thesegerfirm.com

And

Marc S. Tabolsky
Texas Bar No. 24037576
Andrew S. Hicks
Texas Bar No. 24032419
SCHIFFER HICKS JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, Texas 77002
Tel: (713) 357-5150
Fax: (713) 357-5160
ahicks@shjlawfirm.com
mtabolsky@shjlawfirm.com

**SPECIAL LITIGATION COUNSEL TO DEBTORS**

## **CERTIFICATE OF SERVICE**

     I hereby certify that on this _____ day of January 2020, the foregoing was filed in the papers of this case with those parties receiving electronic notices herein presumptively receiving a copy of same.


                                       */s/*_____
                                       By:  Andrew R. Seger

# EXHIBIT "A":

**Steinmetz Lease Document Suite**

**"A-1"  Summary Of Lease Payments Made By Debtors On Behalf Of John Steinmetz**

**"A-2"  Exemplar Substitution of Lease Payments Executed By John Steinmetz**

**Reagor Auto Mall Payments on Tex-Fi Leases to John Steinmetz of Vista Bank**

**2015 Cadillac Escalade Premium July 23, 2015 / Tex-Fi Account # L152 (Vista Bank Lessee)**

| | Date | RAM Check # | Amount |
|---|---|---|---|
| | 8/28/2015 | 119907 | 6,000.00 |
| | 2/23/2016 | 127407 | 6,000.00 |
| | 9/6/2016 | 137887 | 6,000.00 |
| | 2/22/2017 | 149439 | 5,000.00 |
| Subtotal | | | 23,000.00 |
| Total Lease Payments | | | 41,966.16 |
| % of Lease Payments by RAM | | | 55% |
| RAM Purchase of Vehicle | 5/8/2017 | 154399 | 52,026.86 |

**2015 Chevrolet Tahoe LTZ / December 15, 2014 / Tex-Fi Account #L129**

| | Date | Check # | Amount |
|---|---|---|---|
| | 12/29/2014 | 109153 | 14,664.84 |
| | 1/20/2016 | 125975 | 8,664.84 |
| | 7/18/2016 | 135124 | 10,836.00 |
| Subtotal | | | 34,165.68 |
| Total Lease Payments | | | 43,994.52 |
| % of Lease Payments by RAM | | | 78% |

**2016 BMW 750 XI / April 1, 2017 / Tex-Fi Account # L262 (Vista Bank Lessee)**

| | Date | Check # | Amount |
|---|---|---|---|
| | 5/10/2017 | 154274 | 15,005.10 |
| | 11/7/2017 | 167089 | 10,505.10 |
| | 5/14/2018 | 184226 | 15,005.10 |
| Subtotal | | | 40,515.30 |
| Total Lease Payments | | | 60,020.40 |
| % of Lease Payments by RAM | | | 68% |

**2016 Infiniti QX80 / June 14, 2017 / Tex-Fi Account # L281**

| | Date | Check # | Amount |
|---|---|---|---|
| | 7/24/2017 | 159514 | 7,786.32 |
| | 8/1/2017 | 159515 | 7,786.32 |
| | 7/27/2018 | 191159 | 14,274.92 |
| Subtotal | | | 29,847.56 |
| Total Lease Payments | | | 49,125.48 |
| % of Lease Payments by RAM | | | 61% |

**2016 Toyota Land Cruiser April 6, 2016 / Tex-Fi Account # L199**

| | Date | RAM Check # | Amount |
|---|---|---|---|
| | 5/6/2016 | 131388 | 4,060.86 |
| | 11/6/2016 | 141157 | 4,860.86 |
| | 5/10/2017 | 154276 | 4,060.86 |
| | 8/7/2017 | 160434 | 5,898.90 |
| Subtotal | | | 18,881.48 |
| Total Lease Payments | | | 33,043.44 |
| % of Lease Payments by RAM | | | 57% |

| | |
|---|---|
| **Total Lease Payments** | **$228,150.00** |
| **Total RAM Payments:** | **$146,410.02** |
| **% of Total Lease Payments by RAM** | **64%** |





## *Substitution of Lease Payments*

Vista Bank, referred to as Lessee, and Reagor-Dykes Auto Group / Tex-Fi Capital, LLC, referred to as SECURED PARTY, agree:

Vista Bank is indebted to SECURED PARTY pursuant to a lease dated 4/1/2017, in the original principal amount of $95,332.50; with a present total interest and principal balance of $95,332.50, and a security agreement dated 4/1/2017 and has pledged as security for the lease the following:
vin # WBA7F2C5XGG416846

In completing this document, total payments due from Vista Bank each month shall be $750.00 to Tex-Fi Capital, LLC. The Reagor Dykes Auto Group shall make up the difference by paying the remaining $1,750.85 per month of the $2500.85 amount of monthly payments listed on the contract

Dated: 4/1/17

_____ Vista Bank, Current Lessee

_____ , SECURED PARTY

Substitution of Lease Payments



## Substitution of Lease Payments

Vista Bank, referred to as Lessee, and Reagor-Dykes Auto Group / Tex-Fi Capital, LLC, referred to as SECURED PARTY, agree:

Vista Bank is indebted to SECURED PARTY pursuant to a lease dated 7/23/2015, in the original principal amount of $84,518.07; with a present total interest and principal balance of $84,518.07, and a security agreement dated 7/23/2015 and has pledged as security for the lease the following:
vin # 1GYS4NKJ3FR611901

In completing this document, total payments due from Vista Bank each month shall be $748.59 to Tex-Fi Capital, LLC. The Reagor Dykes Auto Group shall make up the difference by paying the remaining $1,000 per month of the $1748.59 amount of monthly payments listed on the contract.

Dated: 7/23/2015

_____, Vista Bank, Current Lessee

_____, SECURED PARTY

Substitution of Lease Payments

# EXHIBIT "B"

**One Year Summary of Deposits In Relation To Economic Activity of
Lmitsu, RDAC and RDT Dealerships**

**EXHIBIT "B"**
**TO DEBTORS FIRST AMENDED COMPLAINT**

| ANALYSIS OF OVERALL BUSINESS RELATIONSHIP OF DEBTORS *REAGOR DYKES IMPORTS, LP* (LMITSU) *REAGOR DYKES PLAINVIEW, LP* (RDT), AND *REAGOR DYKES AUTO COMPANY, LP* (RDAC) WITH VISTA BANK DURING 12 MONTH PERIOD PRECEDING BANKRUPTCY | | |
|---|---|---|
| **Total Deposits For Period From 8/17 to 1/18** | **Total Deposits For Period From 2/18 to 7/18** | **Total Deposits For 12 Month Period From 8/17 to 7/18** |
| $351,286,649.46 | $1,052,762,148.44 | $1,404,048,797.90 |
| **Combined Total COB Overdrafts[1] For Period From 8/17 to 1/18** | **Combined Total COB Overdrafts For Period From 2/18 to 7/18** | **Combined Total COB Overdrafts For 12 Month Period From 8/17 to 7/18** |
| *132 Days* | *237 Days* | *368 Days* |

| VISTA BANKS' ASSET SIZE PER QUARTERLY CALL REPORTS FILED WITH BANK REGULATORS | | | | |
|---|---|---|---|---|
| **Third Qtr. 2017** | **Fourth Qtr. 2017** | **First Qtr. 2018** | **Second Qtr. 2018** | **Third Qtr. 2018** |
| $580,686,000.00 | $604,026,000.00 | $685,963,000.00 | $754,523,000.00 | $777,449,000.00 |

**Seven Quick Facts About LMITSU, RDT & RDAC's Overall Relationship With Vista:**

1.  All referenced deposits were made into just three (3) Demand Deposit Accounts which are similar in nature to business checking accounts.

2.  The combined deposits of the three entities during the six month period between 8/17 and 1/18 is around 51% of the entire asset size of Vista Bank in the First Quarter of 2018.

3.  The combined deposits of the three entities during the six month period between 2/18 and 7/18 is in excess of 135% of the entire asset size of Vista Bank in the Third Quarter of 2018.

4.  The combined deposits of the three entities during the 12 month period between 8/17 and 7/18 is around 180% of the entire asset size of Vista Bank in the Third Quarter of 2018.

5.  Although Vista Bank does not operate on federal holidays or Sundays, the entities' three (3) checking accounts finished the business day overdrawn a combined 132-days within a 183-calendar day period between 8/17 to 1/18.

6.  Although Vista Bank does not operate on federal holidays or Sundays, the entities' three (3) checking accounts finished the business day overdrawn a combined 237 days within a 180-calendar day period from 2/18 through 7/18.

7.  Although Vista Bank does not operate on federal holidays or Sundays, the entities' three checking accounts finished the business day overdrawn a combined 369 days within a 365-calendar day period from 8/17 through 7/18.

---

[1] COB Overdraft Days refers to the number of banking days which the checking account finished the day overdrawn. Banking days do not include Sundays or federal holidays.

| **_Reagor Dykes Imports, LP (LMITSU)_-Vista DDA Account #2058194** | | | | | |
|---|---|---|---|---|---|
| **Per 2016 & 2017 Consolidated Year-End Financials & Vista Bank Statements** | | | | | |
| **DEPOSIT ACTIVITY & OVERDRAFTS IN 12 MONTH PERIOD PRECEDING PETITION DATE** | | | | | |
| **8/17 – 1/18 Deposits & COB Overdraft Days** | | | **2/18 – 7/8 Deposits & COB Overdraft Days** | | |
| Aug. 2017 | $16,313,158.53 | _3 Days_ | Feb. 2018 | $41,118,903.21 | _8 Days_ |
| Sept. 2017 | $20,303,662.70 | _13 Days_ | March 2018 | $62,698,365.30 | _8 Days_ |
| Oct. 2017 | $22,827,694.75 | _4 Days_ | April 2018 | $65,481,589.12 | _14 Days_ |
| Nov. 2017 | $21,950,534.37 | _7 Days_ | May 2018 | $62,477,280.22 | _17 Days_ |
| Dec. 2017 | $22,413,975.45 | _7 Days_ | June 2018 | $63,999,210.96 | _17 Days_ |
| Jan. 2018 | $30,182,219.30 | _12 Days_ | July 2018 | $76,756,930.87 | _12 Days_ |
| **6 Mos. Tot.** | **$133,991,245.10** | _46 Days_ | **6 Mos. Tot.** | **$372,532,279.68** | _77 Days_ |
| | **12 Mos Tot.** | **$506,523,524.78** | | **122 Days** | |

| **ACTUAL BUSINESS OF DEALERSHIP DESCRIBED IN FINANCIAL STATEMENTS PROVIDED TO VISTA** | | | | |
|---|---|---|---|---|
| _2016 Consolidated Annual Financial Statement (Sent by Shane Smith to Toby Cecil on 2/25/17)_ | | | | |
| **Gross Sales For Year** | **Avg. Monthly Sales** | **Avg. Daily Sales** | **2016 Dec. Sales** | **Dec. Inventory** |
| $100,867,426.00 | $8,405,618.83 | $280,187.29 | $9,632,369.00 | $12,329,037.00 |
| _2017 Consolidated Annual Financial Statement (Sent by Shane Smith to Toby Cecil on 3/26/18)_ | | | | |
| **Gross Sales For Year** | **Avg. Monthly Sales** | **Avg. Daily Dales** | **2017 Dec. Sales** | **Dec. Inventory** |
| $93,294,808.00 | $7,774,567.33 | $259,152.24 | $6,629,371.00 | $12,835,086.00 |

| **VISTA BANKS' ASSET SIZE PER QUARTERLY CALL REPORTS FILED WITH BANK REGULATORS** | | | | |
|---|---|---|---|---|
| **Third Qtr. 2017** | **Fourth Qtr. 2017** | **First Qtr. 2018** | **Second Qtr. 2018** | **Third Qrt. 2018** |
| $580,686,000.00 | $604,026,000.00 | $685,963,000.00 | $754,523,000.00 | $777,449,000.00 |

**Nine Quick Facts About Reagor Dykes Imports, LP (Lubbock Mitsubishi Dealership):**

1. Deposits during 6 month period from 8/17 to 1/18 are equal to 132% of entire gross dealership sales for 12 month period comprising fiscal year 2016.

2. August 2017 deposits are nearly 2X average monthly dealership sales for 2016.

3. January 2018 deposits are nearly 3.6X average monthly dealership sales for 2016.

4. Deposits during 6 month period from 8/17 to 1/18 are equal to nearly 20% of Vista Bank's entire asset size in the First Quarter of 2018.

5. Deposits from period of 2/18 to 7/18 are nearly 4X annual dealership sales for 2017, and nearly 2X the combined annual dealership sales for fiscal years 2016 and 2017.

6. February 2018 deposits are 4.89X 2016 average monthly dealership sales, and 5.28X 2017 average monthly dealership sales.

7. July 2018 deposits are 9.13X 2016 average monthly dealership sales, and 9.87X 2017 average monthly dealership sales.

8. Deposits from period of 2/18 to 7/18 are equal to 47.9% of Vista Bank's entire asset size in the Third Quarter of 2018.

9. Deposits during the 12 month period from 8/17 to 7/18 are equal to 65% of Vista Bank's entire asset size in the Third Quarter of 2018.

| Reagor Dykes Plainview, LP (RDT)- Vista DDA Account # 7012788 | | | | |
|---|---|---|---|---|
| Per 2016 & 2017 Consolidated Year End Financials & Vista Bank Statements | | | | |
| DEPOSIT ACTIVITY & OVERDRAFTS IN 12 MONTH PRECEDING PETITION DATE | | | | |

| 8/17 – 1/18 Deposits & COB Overdraft Days | | | Feb – July 2018 Deposits & COB Overdraft Days | | |
|---|---|---|---|---|---|
| Aug. 2017 | $12,973,004.35 | 3 Days | Feb. 2018 | $36,929,435.95 | 9 Days |
| Sept. 2017 | $18,162,609.34 | 5 Days | March 2018 | $60,760,004.48 | 11 Days |
| Oct. 2017 | $19,035,879.83 | 3 Days | April 2018 | $58,622,822.21 | 15 Days |
| Nov. 2017 | $16,527,008.92 | 6 Days | May 2018 | $54,799,694.82 | 17 Days |
| Dec. 2017 | $18,065,275.08 | 6 Days | June 2018 | $60,278,557.08 | 18 Days |
| Jan. 2018 | $28,587,046.08 | 10 Days | July 2018 | $70,876,993.08 | 11 Days |
| 6 Mos. Tot. | $113,350,823.60 | 33 Days | 6 Mos. Tot. | $342,267,507.62 | 81 Days |
| | 12 Mos. Tot. | $455,618,331.22 | | 114 Days | |

| ACTUAL BUSINESS OF DEALERSHIP DESCRIBED IN FINANCIAL STATEMENTS PROVIDED TO VISTA | | | | |
|---|---|---|---|---|
| 2016 Consolidated Financial Statement (Sent by Shane Smith to Toby Cecil on 2/25/17) | | | | |
| Gross Sales For Year | Avg. Monthly Sales | Avg. Daily Sales | 2016 Dec. Sales | Dec. Inventory |
| $66,300,630.00 | $5,525,052.50 | $184,168.42 | $6,990,431.00 | $9,617,840.00 |
| 2017 Consolidated Financial Statement (Sent by Shane Smith to Toby Cecil on 3/26/18) | | | | |
| Gross Sales For Year | Avg. Monthly Sales | Avg. Daily Sales | 2017 Dec. Sales | Dec. Inventory |
| $75,958,516.00 | $6,329,876.33 | $210,995.88 | $6,203,125.00 | $9,927,895.00 |

| VISTA BANKS' ASSET SIZE PER QUARTERLY CALL REPORTS FILED WITH BANK REGULATORS | | | | |
|---|---|---|---|---|
| Third Qtr. 2017 | Fourth Qtr. 2017 | First Qtr. 2018 | Second Qtr. 2018 | Third Qrt. 2018 |
| $580,686,000.00 | $604,026,000.00 | $685,963,000.00 | $754,523,000.00 | $777,449,000.00 |

**Nine Quick Facts About Reagor Dykes Plainview, LP (Plainview Toyota Dealership):**

1. Deposits during 6 month period from 8/17 to 1/18 are equal to _170%_ of entire gross dealership sales for 12 month period comprising fiscal year 2016.

2. August 2017 deposits are _2.34X_ average monthly dealership sales for 2016.

3. January 2018 deposits are _5.17X_ average monthly dealership sales for 2016.

4. Deposits during 6 month period from 8/17 to 1/18 are equal to more than _16.5%_ of Vista Banks entire asset size in the First Quarter of 2018.

5. Deposits from period of 2/18 to 7/18 are nearly _4.5X_ annual dealership sales for 2017, and _2.4X_ the combined annual dealership sales for fiscal years 2016 and 2017.

6. February 2018 deposits are _6.6X_ 2016 average monthly dealership sales, and _5.8X_ 2017 average monthly dealership sales.

7. July 2018 deposits are _12.8X_ 2016 average monthly dealership sales, and _11X_ 2017 average monthly dealership sales.

8. Deposits from period of 2/18 to 7/18 are equal to _44%_ of Vista Bank's entire asset size in the Third Quarter of 2018.

9. Deposits during the 12 month period from 8/17 to 7/18 are equal to _58.6%_ of Vista Bank's entire asset size in the Third Quarter of 2018.

A-3

| Reagor Dykes Auto Company, LP (RDAC)- Vista DDA Account # 2026693: | | | | |
|---|---|---|---|---|
| 2016 & 2017 Year End Consolidated Annual Financials & Vista Bank Statements | | | | |
| DEPOSIT ACTIVITY & OVERDRAFTS IN 12 MONTH PERIOD PRECEDING PETITION DATE | | | | |
| 8/17 – 1/18 Deposits & COB Overdraft Days | | | 2/18 – 7/18 Deposits & COB Overdraft Days | |
| Aug. 2017 | $11,407,606.91 | *3 Days* | Feb. 2018 | $37,163,874.90 | *9 Days* |
| Sept. 2017 | $15,993,670.27 | *13 Days* | March 2018 | $59,781,402.39 | *12 Days* |
| Oct. 2017 | $17,904,638.85 | *8 Days* | April 2018 | $57,746,879.44 | *8 Days* |
| Nov. 2017 | $15,692,206.10 | *8 Days* | May 2018 | $53,383,210.86 | *16 Days* |
| Dec. 2017 | $16,306,759.68 | *10 Days* | June 2018 | $59,308,989.57 | *17 Days* |
| Jan. 2018 | $27,323,686.59 | *11 Days* | July 2018 | $70,578,003.98 | *17 Days* |
| 6 Mos. Tot. | $103,944,580.76 | *53 Days* | 6 Mos. Tot | $337,962,361.14 | *79 Days* |
| | 12 Mos. Tot. | $441,906,941.90 | | *132 Days* | |

| ACTUAL BUSINESS OF DEALERSHIP DESCRIBED IN FINANCIAL STATEMENTS PROVIDED TO VISTA | | | | |
|---|---|---|---|---|
| *2016 Consolidated Financial Statement (Sent by Shane Smith to Toby Cecil on 2/25/17)* | | | | |
| Gross Sales For Year | Avg. Monthly Sales | Avg. Daily Sales | 2016 Dec. Sales | Dec. Inventory |
| $73,278,938.00 | $6,106,578.17 | $203,552.61 | $8,217,614.00 | $11,747,610.00 |
| *2017 Consolidated Financial Statement (Sent by Shane Smith to Toby Cecil on 3/26/18)* | | | | |
| Gross Sales For Year | Avg. Monthly Sales | Avg. Daily Sales | 2017 Dec. Sales | Dec. Inventory |
| $81,149,280.00 | $6,672,440.00 | $225,414.67 | $7,730,626.00 | $11,074,014.00 |

| VISTA BANKS' ASSET SIZE PER QUARTERLY CALL REPORTS FILED WITH BANK REGULATORS | | | | |
|---|---|---|---|---|
| Third Qtr. 2017 | Fourth Qtr. 2017 | First Qtr. 2018 | Second Qtr. 2018 | Third Qtr. 2018 |
| $580,686,000.00 | $604,026,000.00 | $685,963,000.00 | $754,523,000.00 | $777,449,000.00 |

**Nine Quick Facts About Reagor Dykes Auto Company, LP (Plainview Ford Dealership):**

1. Deposits during 6-month period from 8/17 to 1/18 are equal to <u>141%</u> of entire gross dealership sales for 12-month period comprising fiscal year 2016.

2. August 2017 deposits are <u>1.86X</u> average monthly dealership sales for 2016.

3. January 2018 deposits are <u>4.47X</u> average monthly dealership sales for 2016.

4. Deposits during 6 month period from 8/17 to 1/18 are equal to more than <u>15%</u> of Vista Bank's entire asset size in the First Quarter of 2018.

5. Deposits from period of 2/18 to 7/18 are nearly <u>4.17X</u> annual dealership sales for 2017, and <u>2.18X</u> the combined annual dealership sales for fiscal years 2016 and 2017.

6. February 2018 deposits are <u>6X</u> 2016 average monthly dealership sales, and <u>5.56X</u> 2017 average monthly dealership sales.

7. July 2018 deposits are <u>11.5X</u> 2016 average monthly dealership sales, and <u>10.5X</u> 2017 average monthly dealership sales.

8. Deposits from period of 2/18 to 7/18 are equal to <u>43.4%</u> of Vista Bank's entire asset size in the Third Quarter of 2018.

9. Deposits during the 12 month period from 8/17 to 7/18 are equal to <u>56.8%</u> of Vista Bank's entire asset size in the Third Quarter of 2018.

# EXHIBIT "C"
**Analysis of Vista's "Off The Books" Overdraft Loans**

C-1  **Analysis of Lmitsu Vista Overdraft Loans**

C-2  **Analysis of RDT Vista Overdraft Loans**

C-3  **Analysis of RDAC Vista Overdraft Loans**

## EXHIBIT C-1
## Reagor Dykes Imports, LP (Lmitsu)
## Vista DDA Account #2058194:
### ANALYSIS OF VISTA OVERDRAFT LOANS FROM 7/31/16 THROUGH PETITION DATE
Note: Tables do not capture single day overdrafts.

| | | | Lmitsu Vista Overdraft Loans- 7/31/2016 to 12/31/2016 | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 7/31- 8/2 | 3 | - | ($328,603.33) | - | ($50,358.76) |
| - | - | 7/31- 8/1 | ($328,603.33) | ($276,726.79) | - |
| - | - | 8/1- 8/2 | ($276,726.79) | ($50,358.76) | - |
| | | | | | |
| 8/4- 8/5 | 2 | - | ($139,070.80) | - | ($17,854.87) |
| | | | | | |
| 8/12- 8/16 | 3 | - | ($159,958.63) | - | ($212,719.84) |
| - | - | 8/12- 8/15 | ($159,958.63) | ($212,214.42) | - |
| - | - | 8/15- 8/16 | ($212,214.42) | ($212,719.84) | - |
| | | | | | |
| 9/12- 9/21 | 8 | - | ($225,890.96) | - | ($1,018,504.03) |
| - | - | 9/12- 9/13 | ($225,890.96) | ($349,964.50) | - |
| - | - | 9/13- 9/14 | ($349,964.50) | ($442,515.54) | - |
| - | - | 9/14- 9/15 | ($442,515.54) | ($550,349.17) | - |
| - | - | 9/15- 9/16 | ($550,349.17) | ($134,373.58) | - |
| - | - | 9/16- 9/19 | ($134,373.58) | ($355,336.04) | - |
| - | - | 9/19- 9/20 | ($355,336.04) | ($917,170.00) | - |
| - | - | 9/20- 9/21 | ($917,170.00) | ($1,018,504.03) | - |
| | | | | | |
| 10/6- 10/7 | 2 | - | ($58,484.03) | - | ($121,581.61) |
| | | | | | |
| 10/13-10/17 | 3 | - | ($13,549.94) | - | ($40,975.38) |
| - | - | 10/13- 10/14 | ($13,549.94) | ($45,007.95) | - |
| - | - | 10/14- 10/17 | ($45,007.95) | ($40,975.38) | - |
| | | | | | |
| 10/28- 11/1 | 3 | - | ($32,554.10) | - | ($148,663.09) |
| - | - | 10/28- 10/31 | ($32,554.10) | ($225,621.29) | - |
| - | - | 10/31- 11/1 | ($225,621.29) | ($148,663.09) | - |
| | | | | | |
| 11/22- 11/23 | 2 | - | ($71,882.40) | - | ($32,766.69) |
| | | | | | |
| 12/29- 12/31 | 3 | - | ($65,222.58) | - | ($343,023.46) |
| - | - | 12/29- 12/30 | ($65,222.58) | ($342,715.46) | - |
| - | - | 12/30- 12/31 | ($342,715.46) | ($343,023.46) | - |

### Lmitsu Vista Overdraft Loans – 1st Quarter 2017

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 1/3- 1/5 | 3 | - | ($116,038.58) | - | ($9,676.57) |
| - | - | 1/3- 1/4 | ($116,038.58) | ($826.36) | - |
| - | - | 1/4- 1/5 | ($826.36) | ($9,676.57) | - |
| 2/27- 2/28 | 2 | - | ($31,315.30) | - | ($21,040.75) |
| 3/10- 3/20 | 7 | - | ($239,604.75) | - | ($330,931.71) |
| - | - | 3/10- 3/13 | ($239,604.75) | ($10,148.26) | - |
| - | - | 3/13- 3/14 | ($10,148.26) | ($92,376.93) | - |
| - | - | 3/14- 3/15 | ($92,376.93) | ($354,434.81) | - |
| - | - | 3/15- 3/16 | ($354,434.81) | ($308,733.49) | - |
| - | - | 3/16- 3/17 | ($308,733.49) | ($184,103.99) | - |
| - | - | 3/17- 3/20 | ($184,103.99) | ($330,931.71) | - |
| 3/22- 3/23 | 2 | - | ($90,717.25) | - | ($89,062.54) |
| 3/27-3/31 | 5 | - | ($827,643.83) | - | ($553,866.89) |
| - | - | 3/27- 3/28 | ($827,643.83) | ($583,526.71) | - |
| - | - | 3/28- 3/29 | ($583,526.71) | ($73,073.81) | - |
| - | - | 3/29- 3/30 | ($73,073.81) | ($64,950.21) | - |
| - | - | 3/30- 3/31 | ($64,950.21) | ($553,866.89) | - |

### Lmitsu Vista Overdraft Loans – 2nd Quarter 2017

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 4/1- 4/3 | 2 | - | ($562,404.89) | - | ($85,351.91) |
| 4/20- 4/21 | 2 | - | ($76,265.27) | - | ($71,619.61) |
| 4/25- 4/26 | 2 | - | ($68,446.06) | - | ($102,003.56) |
| 4/28- 4/30 | 2 | - | ($7,390.47) | - | ($7,702.22) |
| 5/16- 5/17 | 2 | - | ($104,890.90) | - | ($112,180.00) |
| 5/19- 5/22 | 2 | - | ($38,801.13) | - | ($71,267.88) |
| 6/8- 6/9 | 2 | - | ($78,785.42) | - | ($573.96) |
| 6/14- 6/19 | 4 | - | ($36,893.20) | - | ($87,300.40) |
| - | - | 6/14- 6/15 | ($36,893.20) | ($159,523.62) | - |
| - | - | 6/15- 6/16 | ($159,523.62) | ($206,091.21) | - |
| - | - | 6/16- 6/19 | ($206,091.21) | ($87,300.40) | - |
| 6/21- 6/29 | 7 | - | ($182,152.89) | - | ($205,930.44) |
| - | - | 6/21- 6/22 | ($182,152.89) | ($200,221.53) | - |
| - | - | 6/22- 6/23 | ($200,221.53) | ($107,037.55) | - |

| | | | | | |
|---|---|---|---|---|---|
| - | - | 6/23- 6/26 | ($107,037.55) | ($17,109.76) | - |
| - | - | 6/26- 6/27 | ($17,109.76) | ($136,477.44) | - |
| - | - | 6/27- 6/28 | ($136,477.44) | ($162,722.69) | - |
| - | - | 6/28- 6/29 | ($162,722.69) | ($205,930.44) | - |

### Lmitsu Vista Overdraft Loans – 3rd Quarter 2017

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 7/20- 7/24 | 2 | - | ($157,475.14) | - | ($57,563.92) |
| 8/17- 8/18 | 2 | - | ($81,976.62) | - | ($230,893.21) |
| 9/5- 9/6 | 2 | - | ($9,709.39) | - | ($68,457.70) |
| 9/12- 9/13 | 2 | - | ($183,712.01) | - | ($69,709.67) |
| 9/18- 9/21 | 4 | - | ($62,776.66) | - | ($40,651.30) |
| - | - | 9/18- 9/19 | ($62,776.66) | ($361,423.26) | - |
| - | - | 9/19- 9/20 | ($361,423.26) | ($26,270.23) | - |
| - | - | 9/20- 9/21 | ($26,270.23) | ($40,651.30) | - |
| 9/26- 9/27 | 2 | - | ($337,688.80) | - | ($20,602.25) |
| 9/29- 9/30 | 2 | - | ($115,890.75) | - | ($116,192.76) |

### Lmitsu Vista Overdraft Loans- 4th Quarter 2017

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 10/1- 10/3 | 3 | - | ($117,177.66) | - | ($57,097.16) |
| - | - | 10/1- 10/2 | ($117,177.66) | ($79,713.63) | - |
| - | - | 10/2- 10/3 | ($79,713.63) | ($57,097.16) | - |
| 11/15- 11/17 | 3 | - | ($40,524.14) | - | ($38,530.85) |
| - | - | 11/15- 11/16 | ($40,524.14) | ($88,903.87) | - |
| - | - | 11/16- 11/17 | ($88,903.87) | ($38,530.85) | - |
| 12/5- 12/6 | 2 | - | ($378,958.41) | - | ($185,895.60) |
| 12/14- 12/18 | 3 | - | ($133,477.15) | - | ($399,659.30) |
| - | - | 12/14- 12/15 | ($133,477.15) | ($93,635.74) | - |
| - | - | 12/15- 12/18 | ($93,635.74) | ($399,659.30) | - |

**Limitsu Vista OD Loans- 1st Quarter 2018**

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 1/11- 1/12 | 2 | - | ($247,094.28) | - | ($191,811.69) |
| 1/18- 1/23 | 4 | - | ($924,958.53) | - | ($151,423.77) |
| - | - | 1/18- 1/19 | ($924,958.53) | ($171,799.54) | |
| - | - | 1/19- 1/22 | ($171,799.54) | ($1,493.94) | - |
| - | - | 1/22- 1/23 | ($1,493.94) | ($151,423.77) | - |
| 1/26- 1/31 | 4 | - | ($276,352.95) | - | ($286,874.28) |
| - | - | 1/26- 1/29 | ($276,352.95) | ($847,568.45) | |
| - | - | 1/29- 1/30 | ($847,568.45) | ($122,690.24) | - |
| - | - | 1/30- 1/31 | ($122,690.24) | ($286,874.28) | - |
| 2/2- 2/6 | 3 | - | ($177,998.00) | - | ($1,372,688.18) |
| - | - | 2/2- 2/5 | ($177,998.00) | ($86,790.40) | |
| - | - | 2/5- 2/6 | ($86,790.40) | ($1,372,688.18) | - |
| 2/23- 2/26 | 2 | - | ($73,742.73) | - | ($19,476.37) |
| 3/2- 3/5 | 2 | - | ($77,902.08) | - | ($19,851.53) |
| 3/7- 3/9 | 3 | - | ($367,113.34) | - | ($438.45) |
| - | - | 3/7- 3/8 | ($367,113.34) | ($164,309.76) | |
| - | - | 3/8- 3/9 | ($164,309.76) | ($438.45) | - |

**Lmitsu Vista OD Loans- 2nd Quarter 2018**

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 4/3- 4/4 | 2 | - | ($131,154.17) | - | ($75,078.49) |
| 4/6- 4/9 | 2 | - | ($40,044.23) | - | ($88,530.41) |
| 4/16- 4/23 | 6 | - | ($220,285.14) | - | ($4,521.59) |
| - | - | 4/16- 4/17 | ($220,285.14) | ($208,672.68) | |
| - | - | 4/17- 4/18 | ($208,672.68) | ($254,170.24) | - |
| - | - | 4/18- 4/19 | ($254,170.24) | ($136,981.46) | - |
| - | - | 4/19- 4/20 | ($136,981.46) | ($344,091.05) | - |
| - | - | 4/20- 4/23 | ($344,091.05) | ($4,521.59) | - |
| 4/25- 4/27 | 3 | - | ($255,252.65) | - | ($180,717.83) |
| - | - | 4/25- 4/26 | ($255,252.65) | ($237,675.88) | |
| - | - | 4/26- 4/27 | ($237,675.88) | ($180,717.83) | - |
| 5/7- 5/8 | 2 | - | ($88,338.51) | - | ($68,063.69) |
| 5/10- 5/29 | 13 | - | ($60,572.82) | - | ($849,794.85) |
| - | - | 5/10- 5/11 | ($60,572.82) | ($32,392.98) | |
| - | - | 5/11- 5/14 | ($32,392.98) | ($56,562.82) | |

| | | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| - | - | 5/14- 5/15 | ($56,562.82) | ($181,876.01) | - |
| - | - | 5/15- 5/16 | ($181,876.01) | ($130,816.00) | - |
| - | - | 5/16- 5/17 | ($130,816.00) | ($171,538.02) | - |
| - | - | 5/17- 5/18 | ($171,538.02) | ($382,253.81) | - |
| - | - | 5/18- 5/21 | ($382,253.81) | ($240,940.71) | - |
| - | - | 5/21- 5/22 | ($240,940.71) | ($422,969.13) | - |
| - | - | 5/22- 5/23 | ($422,969.13) | ($278,200.55) | - |
| - | - | 5/23- 5/24 | ($278,200.55) | ($208,538.78) | - |
| - | - | 5/24- 5/25 | ($208,538.78) | ($440,805.62) | - |
| - | - | 5/25- 5/29 | ($440,805.62) | ($849,794.85) | - |
| **5/31- 6/1** | **2** | - | ($120,105.60) | - | ($21,429.03) |
| **6/5- 6/7** | **3** | - | ($484,536.02) | - | ($316,132.35) |
| - | - | 6/5- 6/6 | ($484,536.02) | ($397,870.84) | - |
| - | - | 6/6- 6/7 | ($397,870.84) | ($316,132.35) | - |
| **6/12- 6/14** | **3** | - | ($121,331.49) | - | ($38,827.59) |
| - | - | 6/12- 6/13 | ($121,331.49) | ($61,071.83) | - |
| - | - | 6/13- 6/14 | ($61,071.83) | ($38,827.59) | - |
| **6/20- 6/30** | **9** | - | ($244,161.59) | - | ($1,062,033.79) |
| - | - | 6/20- 6/21 | ($244,161.59) | ($490,906.97) | - |
| - | - | 6/21- 6/22 | ($490,906.97) | ($732,525.43) | - |
| - | - | 6/22- 6/25 | ($732,525.43) | ($1,567,227.99) | - |
| - | - | 6/25- 6/26 | ($1,567,227.99) | ($679,765.45) | - |
| - | - | 6/26- 6/27 | ($679,765.45) | ($1,731,387.54) | - |
| - | - | 6/27- 6/28 | ($1,731,387.54) | ($1,543,642.31) | - |
| - | - | 6/28- 6/29 | ($1,543,642.31) | ($1,061,609.29) | - |
| - | - | 6/29- 6/30 | ($1,061,609.29) | ($1,062,033.79) | - |

### RDI Vista Overdraft Persisting 2+ Consecutive Days- July 2018

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| **7/1- 7/3** | **3** | - | ($1,077,544.79) | - | ($10,562.19) |
| - | - | 7/1- 7/2 | ($1,077,544.79) | ($508,565.70) | - |
| - | - | 7/2- 7/3 | ($508,565.70) | ($10,562.19) | - |
| **7/9- 7/10** | **2** | - | ($301,385.14) | - | ($1,077,497.36) |
| **7/12- 7/16** | **3** | - | ($611,018.26) | - | ($444,153.29) |
| - | - | 7/12- 7/13 | ($611,018.26) | ($604,875.52) | - |
| - | - | 7/13- 7/16 | ($604,875.52) | ($444,153.29) | - |
| **7/27- 7/30** | **2** | - | ($192,426.22) | - | ($834,496.57) |

## EXHIBIT C-2
## Reagor Dykes Auto Company, LP (RDAC)
### Vista DDA Account # 2026693:
**ANALYSIS OF VISTA OVERDRAFT LOANS FROM 7/31/16 THROUGH PETITION DATE**
Note: Table does not capture single day overdrafts.

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| **2016 RDAC Vista Overdraft Loans - 7/31/16 to 12/31/16** | | | | | |
| *7/31 - 8/4* | 5 | - | **($186,575.91)** | - | **($78,189.92)** |
| - | - | 7/31-8/1 | ($186,575.91) | ($217,334.32) | - |
| | | | | | |
| - | - | 8/1-8/2 | ($217,334.32) | ($214,617.78) | - |
| - | - | 8/2-8/3 | ($214,617.78) | ($164,394.07) | - |
| - | - | 8/3-8/4 | ($164,394.07) | ($78,189.92) | - |
| | | | | | |
| *8/19 -8/23* | 3 | - | **($63,880.66)** | - | **($56,432.93)** |
| - | - | 8/19-8/22 | ($63,880.66) | ($258,989.59) | - |
| - | - | 8/22-8/23 | ($258,989.59) | ($56,432.93) | - |
| | | | | | |
| *9/20 -9/21* | 2 | - | **($181,263.81)** | - | **($198,551.30)** |
| | | | | | |
| *10/27 -10/31* | 3 | - | **($25,141.42)** | - | **($156,686.51)** |
| - | - | 10/27-10/28 | ($25,141.42) | ($71,588.99) | - |
| - | - | 10/28-10/31 | ($71,588.99) | ($156,686.51) | - |
| | | | | | |
| *11/14 -11/16* | 3 | - | **($23,553.28)** | - | **($12,863.66)** |
| - | - | 11/14-11/15 | ($23,553.28) | ($36,230.74) | - |
| - | - | 11/15-11/16 | ($36,230.74) | ($12,863.66) | - |
| | | | | | |
| *12/19 -12/21* | 3 | - | **($102,440.49)** | - | **($148,676.41)** |
| - | - | 12/19-12/20 | ($102,440.49) | ($240,017.47) | - |
| - | - | 12/20-12/21 | ($240,017.47) | ($148,676.41) | - |

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| **RDAC Vista Overdraft Loans – 1st Quarter 2017** | | | | | |
| *1/11 -1/12* | 2 | - | **($137,713.67)** | - | **($2,904.21)** |
| | | | | | |
| *1/18 - 1/19* | 2 | - | **($56,740.41)** | - | **($64,123.35)** |
| | | | | | |
| *3/17 - 3/20* | 2 | - | **($80,847.26)** | - | **($190,044.87)** |
| | | | | | |
| *3/22 - 3/28* | 5 | - | **($115,849.51)** | - | **($347,398.08)** |
| - | - | 3/22-3/23 | ($115,849.51) | ($325,498.04) | - |
| - | - | 3/23- 3/24 | ($325,498.04) | ($469,973.03) | - |
| | | | | | |
| - | - | 3/24- 3/27 | ($469,973.03) | ($669,377.82) | - |
| - | - | 3/27- 3/28 | ($669,377.82) | ($347,398.08) | - |

| 3/30- 3/31 | 2 | - | ($75,501.99) | - | ($126,615.25) |
|---|---|---|---|---|---|

### RDAC Vista Overdraft Loans – 2nd Quarter 2017

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 4/3- 4/7 | 5 | - | ($112,784.09) | - | ($69,738.86) |
| - | - | 4/3- 4/4 | ($112,784.09) | ($277,667.57) | - |
| - | - | 4/4-4/5 | ($277,667.57) | ($184,280.77) | - |
| - | - | 4/5- 4/6 | ($184,280.77) | ($231,220.93) | - |
| - | - | 4/6- 4/7 | ($231,220.93) | ($69,738.86) | - |
| 4/20-4/21 | 2 | - | ($124,256.80) | - | ($91,372.48) |
| 5/18 -5/23 | 4 | - | ($368,298.53) | - | ($128,697.90) |
| - | - | 5/18-5/19 | ($368,298.53) | ($71,890.37) | - |
| - | - | 5/19-5/22 | ($71,890.37) | ($407,428.97) | - |
| - | - | 5/22-5/23 | ($407,428.97) | ($128,697.90) | - |
| 6/13 -6/14 | 2 | - | ($80,377.77) | - | ($135,806.18) |
| 6/22/-6/30 | 7 | - | ($221,115.14) | - | ($22,986.43) |
| - | - | 6/22-6/23 | ($221,115.14) | ($524,555.63) | - |
| - | - | 6/23-6/26 | ($524,555.63) | ($311,053.79) | - |
| - | - | 6/26-6/27 | ($311,053.79) | ($126,294.40) | - |
| - | - | 6/27-6/28 | ($126,294.40) | ($248,822.59) | - |
| - | - | 6/28-6/29 | ($248,822.59) | ($136,469.86) | - |
| - | - | 6/29-6/30 | ($136,469.86) | ($22,986.43) | - |

### RDAC Vista Overdraft Loans – 3rd Quarter 2017

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 7/3- 7/6 | 3 | - | ($94,412.13) | - | ($35,931.71) |
| - | - | 7/3- 7/5 | ($94,412.13) | ($354,711.17) | - |
| - | - | 7/5-7/6 | ($354,711.17) | ($35,931.71) | - |
| 7/12-7/13 | 2 | - | ($181,044.17) | - | ($74,037.21) |
| 9/14 -9/19 | 4 | - | ($128,983.45) | - | ($141,246.04) |
| - | - | 9/14-9/15 | ($128,983.45) | ($79,850.19) | - |
| - | - | 9/15-9/18 | ($79,850.19) | ($309,889.25) | - |
| - | - | 9/18-9/19 | ($309,889.25) | ($141,246.04) | - |
| 9/21 -9/26 | 4 | - | ($525,964.33) | - | ($165,404.62) |
| - | - | 9/21-9/22 | ($525,964.33) | ($705,105.52) | - |
| - | - | 9/22-9/25 | ($705,105.52) | ($29,054.88) | - |
| - | - | 9/25-9/26 | ($29,054.88) | ($165,404.62) | - |
| 9/28 -9/30 | 3 | - | ($138,055.74) | - | ($44,497.70) |

| - | - | 9/28-9/29 | ($138,055.74) | ($44,286.20) | - |
| - | - | 9/29-9/30 | ($44,286.20) | ($44,497.70) | - |

| RDAC Vista Overdraft Loans- 4th Quarter 2017 | | | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 10/1 - 10/2 | 2 | - | ($62,961.70) | - | ($128,689.49) |
| | | | | | |
| 10/16 -10/18 | 3 | - | ($150,734.83) | | ($24,570.38) |
| - | - | 10/16-10/17 | ($150,734.83) | ($109,477.06) | - |
| - | - | 10/17-10/18 | ($109,477.06) | ($24,570.38) | - |
| | | | | | |
| 10/30 -10/31 | 2 | - | ($16,990.68) | - | ($37,816.90) |
| | | | | | |
| 11/13 -11/16 | 4 | - | ($140,002.26) | - | ($76,668.69) |
| - | - | 11/13-11/14 | ($140,002.26) | ($81,028.59) | - |
| - | - | 11/14-11/15 | ($81,028.59) | ($33,494.17) | - |
| - | - | 11/15-11/16 | ($33,494.17) | ($76,668.69) | - |
| | | | | | |
| 11/20 - 11/21 | 2 | - | ($154,478.69) | - | ($139,879.77) |
| | | | | | |
| 12/11- 12/21 | 9 | - | ($17,736.14) | | ($355,919.33) |
| - | - | 12/11-12/12 | ($17,736.14) | ($57,502.75) | - |
| - | - | 12/12-12/13 | ($57,502.75) | ($204,135.86) | - |
| - | - | 12/13-12/14 | ($204,135.86) | ($261,568.30) | - |
| - | - | 12/14-12/15 | ($261,568.30) | ($213,670.55) | - |
| - | - | 12/15-12/18 | ($213,670.55) | ($645,298.90) | - |
| - | - | 12/18-12/19 | ($645,298.90) | ($197,712.40) | - |
| - | - | 12/19-12/20 | ($197,712.40) | ($54,761.07) | - |
| - | - | 12/20-12/21 | ($54,761.07) | ($355,919.33) | - |

| RDAC Vista Overdraft Loans- 1st Quarter 2018 | | | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 1/2 -1/4 | 3 | - | ($122,615.16) | - | ($6,510.87) |
| - | - | 1/2 – 1/3 | ($122,615.16) | ($90,162.05) | - |
| - | - | 1/3 – 1/4 | ($90,162.05) | ($6,510.87) | - |
| | | | | | |
| 1/18 - 1/23 | 4 | - | ($635,670.36) | - | ($823,509.35) |
| - | - | 1/18- 1/19 | ($635,670.36) | ($1,399,235.59) | - |
| - | - | 1/19- 1/22 | ($1,399,235.59) | ($1,002,267.16) | - |
| - | - | 1/22- 1/23 | ($1,002,267.16) | ($823,509.35) | - |
| | | | | | |
| 1/26 - 1/29 | 2 | - | ($162,493.18) | - | ($1,134,382.07) |
| | | | | | |
| 1/31 - 2/2 | 3 | - | ($285,513.29) | - | ($550,531.59) |
| - | - | 1/31- 2/1 | ($285,513.29) | ($865,570.38) | - |
| - | - | 2/1- 2/2 | ($865,570.38) | ($550,531.59) | - |
| | | | | | |
| 2/9 -2/14 | 4 | - | ($511,271.11) | - | ($189,138.09) |

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| - | - | 2/9- 2/12 | ($511,271.11) | ($487,448.19) | - |
| - | - | 2/12- 2/13 | ($487,448.19) | ($182,640.97) | - |
| - | - | 2/13- 2/14 | ($182,640.97) | ($189,138.09) | |
| 2/23 -2/26 | 2 | - | ($142,972.29) | - | ($339,430.11) |
| 3/12 - 3/16 | 5 | - | ($11,846.35) | - | ($206,957.73) |
| - | - | 3/12-3/13 | ($11,846.35) | ($148,646.72) | |
| - | - | 3/13- 3/14 | ($148,646.72) | ($261,889.67) | - |
| - | - | 3/14- 3/15 | ($261,889.67) | ($197,930.38) | - |
| - | - | 3/15- 3/16 | ($197,930.38) | ($206,957.73) | |
| 3/28 - 3/31 | 4 | - | ($13,636.12) | - | ($48,113.34) |
| - | - | 3/28-3/29 | ($13,636.12) | ($94,089.89) | |
| - | - | 3/29- 3/30 | ($94,089.89) | ($47,650.84) | - |
| - | - | 3/30- 3/31 | ($47,650.84) | ($48,113.34) | - |

| RDAC Vista Overdraft Loans- 2nd Quarter 2018 | | | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 4/16 - 4/17 | 2 | - | ($63,267.00) | - | ($140,860.87) |
| 4/20 - 4/24 | 3 | - | ($12,620.89) | - | ($240,970.37) |
| - | - | 4/20- 4/23 | ($12,620.89) | ($419,040.96) | |
| - | - | 4/23- 4/24 | ($419,040.96) | ($240,970.37) | - |
| 4/26 - 4/27 | 2 | - | ($57,753.77) | - | ($145,771.23) |
| 5/1 - 5/2 | 2 | - | ($728,719.95) | - | ($118,162.85) |
| 5/9 - 5/15 | 5 | - | ($46,668.63) | - | ($277,956.52) |
| - | - | 5/9- 5/10 | ($46,668.63) | ($324,886.09) | |
| - | - | 5/10- 5/11 | ($324,886.09) | ($319,516.12) | - |
| - | - | 5/11- 5/14 | ($319,516.12) | ($167,145.20) | - |
| - | - | 5/14- 5/15 | ($167,145.20) | ($277,956.52) | - |
| 5/17 - 5/24 | 6 | - | ($132,264.74) | - | ($118,850.94) |
| - | - | 5/17- 5/18 | ($132,264.74) | ($212,489.16) | |
| - | - | 5/18- 5/21 | ($212,489.16) | ($384,581.32) | - |
| - | - | 5/21- 5/22 | ($384,581.32) | ($111,134.49) | - |
| - | - | 5/22- 5/23 | ($111,134.49) | ($27,883.17) | - |
| - | - | 5/23- 5/24 | ($27,883.17) | ($118,850.94) | - |
| 5/29 - 5/31 | 3 | - | ($26,295.07) | - | ($10,747.32) |
| - | - | 5/29- 5/30 | ($26,295.07) | ($368,860.40) | |
| - | - | 5/30- 5/31 | ($368,860.40) | ($10,747.32) | - |
| 6/4 - 6/5 | 2 | - | ($40,034.37) | - | ($128,296.20) |
| 6/7 - 6/15 | 7 | - | ($191,432.81) | - | ($582,269.03) |
| - | - | 6/7- 6/8 | ($191,432.81) | ($20,651.36) | |
| - | - | 6/8- 6/11 | ($20,651.36) | ($507,845.71) | - |
| - | - | 6/11- 6/12 | ($507,845.71) | ($120,844.80) | - |

| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| - | - | 6/12- 6/13 | ($120,844.80) | ($160,305.11) | - |
| - | - | 6/13- 6/14 | ($160,305.11) | ($510,344.59) | - |
| - | - | 6/14- 6/15 | ($510,344.59) | ($582,269.03) | - |
| 6/19 - 6/28 | 8 | - | ($638,194.26) | - | ($54,342.53) |
| - | - | 6/19- 6/20 | ($638,194.26) | ($731,498.45) | - |
| - | - | 6/20- 6/21 | ($731,498.45) | ($651,146.46) | - |
| - | - | 6/21- 6/22 | ($651,146.46) | ($569,462.38) | - |
| - | - | 6/22- 6/25 | ($569,462.38) | ($1,308,162.65) | - |
| - | - | 6/25- 6/26 | ($1,308,162.65) | ($465,055.76) | - |
| - | - | 6/26- 6/27 | ($465,055.76) | ($1,178,679.28) | - |
| - | - | 6/27- 6/28 | ($1,178,679.28) | ($54,342.53) | - |

| RDAC Vista Overdraft Loans- July 2018 | | | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. Number of OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 7/2 - 7/5 | 3 | - | ($428,813.34) | - | ($349,222.21) |
| - | - | 7/2- 7/3 | ($428,813.34) | ($599,826.53) | - |
| - | - | 7/3- 7/5 | ($599,826.53) | ($349,222.21) | - |
| 7/9 - 7/17 | 7 | - | ($35,293.59) | - | ($378,501.06) |
| - | - | 7/9- 7/10 | ($35,293.59) | ($1,043,073.03) | - |
| - | - | 7/10- 7/11 | ($1,043,073.03) | ($294,176.61) | - |
| - | - | 7/11- 7/12 | ($294,176.61) | ($888,808.73) | - |
| - | - | 7/12- 7/13 | ($888,808.73) | ($548,843.94) | - |
| - | - | 7/13- 7/16 | ($548,843.94) | ($867,302.41) | - |
| - | - | 7/16- 7/17 | ($867,302.41) | ($378,501.06) | - |
| 7/19 - 7/24 | 4 | - | ($584,218.26) | - | ($151,978.74) |
| - | - | 7/19-7/20 | ($584,218.26) | ($912,509.25) | - |
| - | - | 7/20- 7/23 | ($912,509.25) | ($409,640.41) | - |
| - | - | 7/23- 7/24 | ($409,640.41) | ($151,978.74) | - |
| 7/30 - 7/31 | 2 | - | ($71,226.34) | - | ($106,203.93) |

**EXHIBIT C-3**
**Reagor Dykes Plainview, LP (RDT)**
**Vista DDA Account # 7012788**
**ANALYSIS OF VISTA OVERDRAFT LOANS FROM 7/31/16 THROUGH PETITION DATE**
Note: Tables do not capture single day overdrafts.

| RDT Vista Overdrafts Loans 2016- 7/31/16 to 12/31/16 | | | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 7/31- 8/1 | 2 | - | ($357,829.95) | - | ($353,051.11) |
| | | | | | |
| 9/12- 9/13 | 2 | - | ($152,724.99) | - | ($392,450.33) |
| | | | | | |
| 9/16- 9/22 | 5 | - | ($41,786.71) | - | ($39,233.82) |
| - | - | 9/16- 9/19 | ($41,786.71) | ($140,223.27) | - |
| - | - | 9/19- 9/20 | ($140,223.27) | ($459,428.03) | - |
| - | - | 9/20- 9/21 | ($459,428.03) | ($56,036.97) | - |
| - | - | 9/21- 9/22 | ($56,036.97) | ($39,233.82) | - |
| | | | | | |
| 10/13- 10/14 | 2 | - | ($86,540.09) | - | ($16,286.60) |
| | | | | | |
| 12/19- 12/20 | 2 | - | ($53,803.57) | - | ($287,176.04) |

| RDT Vista Overdraft Loans – 1st Quarter 2017 | | | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 3/16- 3/20 | 3 | - | ($161,562.59) | - | ($142,649.99) |
| - | - | 3/16- 3/17 | ($161,562.59) | ($152,467.67) | |
| - | - | 3/17- 3/20 | ($152,467.67) | ($142,649.99) | - |
| | | | | | |
| 3/22- 3/28 | 5 | - | ($71,438.27) | - | ($74,889.23) |
| - | - | 3/22- 3/23 | ($71,438.27) | ($225,361.22) | - |
| - | - | 3/23- 3/24 | ($225,361.22) | ($361,124.35) | |
| - | - | 3/24- 3/27 | ($361,124.35) | ($560,202.67) | - |
| - | - | 3/27- 3/28 | ($560,202.67) | ($74,889.23) | |
| | | | | | |
| 3/30- 3/31 | 2 | - | ($171,214.42) | - | ($14,949.78) |

C3- 1 of 4

| | | RDT Vista Overdraft Loans– 2nd Quarter 2017 | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 4/3- 4/4 | 2 | - | ($214,215.83) | - | ($60,674.62) |
| | | | | | |
| 4/10- 4/14 | 5 | - | ($134,811.42) | - | ($59,919.70) |
| - | - | 4/10- 4/11 | ($134,811.42) | ($92,339.75) | - |
| - | - | 4/11- 4/12 | ($92,339.75) | ($81,748.21) | - |
| - | - | 4/12- 4/13 | ($81,748.21) | ($157,900.04) | - |
| - | - | 4/13- 4/14 | ($157,900.04) | ($59,919.70) | - |
| | | | | | |
| 4/25- 4/26 | 2 | - | ($142,742.78) | - | ($111,600.88) |
| | | | | | |
| 5/3- 5/4 | 2 | - | ($130,963.48) | - | ($420,235.51) |
| | | | | | |
| 5/17- 5/18 | 2 | - | ($23,782.90) | - | ($15,732.18) |
| | | | | | |
| 6/7- 6/8 | 2 | - | ($127,373.46) | - | ($42,341.02) |
| | | | | | |
| 6/16- 6/19 | 2 | - | ($37,268.13) | - | ($190,364.14) |
| | | | | | |
| 6/21- 6/23 | 3 | - | ($17,883.59) | - | ($50,128.29) |
| - | - | 6/21- 6/22 | ($17,883.59) | ($174,803.02) | - |
| - | - | 6/22- 6/23 | ($174,803.02) | ($50,128.29) | - |
| | | | | | |
| 6/28- 6/29 | 2 | - | ($250,333.61) | - | ($326,760.06) |

| | | RDT Vista Overdraft Loans – 3rd Quarter 2017 | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 8/10- 8/11 | 2 | - | ($1,344.15) | - | ($113,543.08) |
| | | | | | |
| 9/18- 9/19 | 2 | - | ($92,062.48) | - | ($270,635.73) |
| | | | | | |
| 9/21- 9/22 | 2 | - | ($620,609.99) | - | ($69,597.43) |

| | | RDT Vista Overdraft Loans- 4th Quarter 2017 | | | |
|---|---|---|---|---|---|
| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
| 11/9- 11/14 | 4 | - | ($229,318.45) | - | ($69,375.57) |
| - | - | 11/9- 11/10 | ($229,318.45) | ($77,785.28) | - |
| - | - | 11/10- 11/13 | ($77,785.28) | ($109,009.68) | - |
| - | - | 11/13- 11/14 | ($109,009.68) | ($69,375.57) | - |
| 12/13/17- 12/20/17 | 6 | - | ($238,481.33) | - | ($104,424.92) |
| - | - | 12/13- 12/14 | ($238,481.33) | ($152,104.52) | - |
| - | - | 12/14- 12/15 | ($152,104.52) | ($439,945.45) | - |
| - | - | 12/15- 12/18 | ($439,945.45) | ($1,139,958.77) | - |
| - | - | 12/18- 12/19 | ($1,139,958.77) | ($805,995.17) | - |

| - | - | 12/19- 12/20 | ($805,995.17) | ($104,424.92) | - |
|---|---|---|---|---|---|

### RDT Vista Overdraft Loans- 1st Quarter 2018

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 1/18- 1/23 | 4 | - | ($1,362,839.50) | - | ($943,945.70) |
| - | - | 1/18- 1/19 | ($1,362,839.50) | ($737,394.83) | - |
| - | - | 1/19- 1/22 | ($737,394.83) | ($1,873,915.52) | - |
| - | - | 1/22- 1/23 | ($1,873,915.52) | ($943,945.70) | - |
| | | | | | |
| 1/25- 1/29 | 3 | - | ($102,571.42) | - | ($1,049,785.88) |
| - | - | 1/25- 1/26 | ($102,571.42) | ($775,047.97) | - |
| - | - | 1/26/ 1/29 | ($775,047.97) | ($1,049,785.88) | - |
| | | | | | |
| 1/31- 2/1 | 2 | - | ($149,808.87) | - | ($191,324.36) |
| | | | | | |
| 2/5- 2/6 | 2 | - | ($287,116.84) | - | ($1,150,956.62) |
| | | | | | |
| 2/16- 2/20 | 2 | - | ($237,748.75) | - | ($212,403.11) |
| | | | | | |
| 2/26- 2/27 | 2 | - | ($106,717.55) | - | ($151,393.53) |
| | | | | | |
| 3/1- 3/2 | 2 | - | ($47,157.55) | - | ($155,135.83) |
| | | | | | |
| 3/9- 3/12 | 2 | - | ($96,725.90) | - | ($372,599.16) |
| | | | | | |
| 3/15- 3/16 | 2 | - | ($4,044.19) | - | ($21,975.51) |
| | | | | | |
| 3/20- 3/21 | 2 | - | ($230,126.76) | - | ($383,626.97) |
| | | | | | |
| 3/28- 3/29 | 2 | - | ($109,549.08) | - | ($96,560.01) |

### RDT Vista Overdraft Loans- 2nd Quarter 2018

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 4/6- 4/9 | 2 | - | ($352,433.07) | - | ($32,434.17) |
| | | | | | |
| 4/11- 4/16 | 4 | - | ($104,665.85) | - | ($241,997.76) |
| - | - | 4/11- 4/12 | ($104,665.85) | ($421,513.06) | - |
| - | - | 4/12- 4/13 | ($421,513.06) | ($296,523.01) | - |
| - | - | 4/13- 4/16 | ($296,523.01) | ($241,997.76) | - |
| | | | | | |
| 4/19- 4/27 | 7 | - | ($260,243.07) | - | ($13,807.49) |
| - | - | 4/19- 4/20 | ($260,243.07) | ($100,245.22) | - |
| - | - | 4/20- 4/23 | ($100,245.22) | ($217,882.17) | - |
| - | - | 4/23- 4/24 | ($217,882.17) | ($84,559.35) | - |
| - | - | 4/24- 4/25 | ($84,559.35) | ($110,912.33) | - |
| - | - | 4/25- 4/26 | ($110,912.33) | ($67,762.77) | - |
| - | - | 4/26- 4/27 | ($67,762.77) | ($13,807.49) | - |

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 5/1- 5/8 | 6 | - | ($664,631.05) | - | ($33,368.31) |
| - | - | 5/1-5/2 | ($664,631.05) | ($105,967.66) | - |
| - | - | 5/2- 5/3 | ($105,967.66) | ($141,529.19) | - |
| - | - | 5/3- 5/4 | ($141,529.19) | ($87,546.92) | - |
| - | - | 5/4- 5/7 | ($87,546.92) | ($141,393.23) | - |
| - | - | 5/7- 5/8 | ($141,393.23) | ($33,368.31) | - |
| 5/16- 5/30 | 10 | - | ($256,920.26) | - | ($492,062.80) |
| - | - | 5/16- 5/17 | ($256,920.26) | ($255,104.17) | - |
| - | - | 5/17- 5/18 | ($255,104.17) | ($51,558.08) | - |
| - | - | 5/18- 5/21 | ($51,558.08) | ($112,603.90) | - |
| - | - | 5/21- 5/22 | ($112,603.90) | ($292,998.95) | - |
| - | - | 5/22- 5/23 | ($292,998.95) | ($349,862.97) | - |
| - | - | 5/23- 5/24 | ($349,862.97) | ($172,921.04) | - |
| - | - | 5/24- 5/25 | ($172,921.04) | ($272,664.10) | - |
| - | - | 5/25- 5/29 | ($272,664.10) | ($483,119.06) | - |
| - | - | 5/29- 5/30 | ($483,119.06) | ($492,062.80) | - |
| 6/4- 6/5 | 2 | - | ($165,301.77) | - | ($207,358.23) |
| 6/7- 6/12 | 4 | - | ($123,460.90) | - | ($107,626.49) |
| - | - | 6/7- 6/8 | ($123,460.90) | ($46,487.59) | - |
| - | - | 6/8- 6/11 | ($46,487.59) | ($207,970.00) | - |
| - | - | 6/11- 6/12 | ($207,970.00) | ($107,626.49) | - |
| 6/14- 6/19 | 4 | - | ($259,266.52) | - | ($547,177.76) |
| - | - | 6/14- 6/15 | ($259,266.52) | ($832,969.67) | - |
| - | - | 6/15- 6/18 | ($832,969.67) | ($1,272,587.24) | - |
| - | - | 6/18- 6/19 | ($1,272,587.24) | ($547,177.76) | - |
| 6/21- 6/30 | 8 | - | ($576,990.90) | - | ($132,849.63) |
| - | - | 6/21- 6/22 | ($576,990.90) | ($776,475.43) | - |
| - | - | 6/22- 6/25 | ($776,475.43) | ($1,575,675.87) | - |
| - | - | 6/25- 6/26 | ($1,575,675.87) | ($480,300.68) | - |
| - | - | 6/26- 6/27 | ($480,300.68) | ($1,241,155.15) | - |
| - | - | 6/27- 6/28 | ($1,241,155.15) | ($1,139,453.88) | - |
| - | - | 6/28- 6/29 | ($1,139,453.88) | ($132,533.88) | - |
| - | - | 6/29- 6/30 | ($132,533.88) | ($132,849.63) | - |

**RDT Vista Overdraft Loans- July 2018**

| Agg. Date Range | Agg. No. OD Days | 2 Day OD Range | Beginning OD | 2 Day OD Bal | Ending OD Bal |
|---|---|---|---|---|---|
| 7/6- 7/10 | 3 | - | ($102,703.57) | - | ($880,672.00) |
| - | - | 7/6- 7/9 | ($102,703.57) | ($795,964.85) | - |
| - | - | 7/9- 7/10 | ($795,964.85) | ($880,672.00) | - |
| 7/23- 7/24 | 2 | - | ($1,151,359.44) | - | ($1,154,149.42) |
| 7/30- 7/31 | 2 | - | ($104,074.31) | - | ($141,788.31) |

C3- 4 of 4

# EXHIBIT "D"
**September 2016 Email Exchange Between Toby Cecil and Bart Reagor**

To: ssmith@reagordykes.com[ssmith@reagordykes.com]; jhoel@reagordykes.com[jhoel@reagordykes.com];
rblacklock@reagordykes.com[rblacklock@reagordykes.com]; dykesrick@yahoo.com[dykesrick@yahoo.com];
bfansler@reagordykes.com[bfansler@reagordykes.com]
Cc: tcecil@vistabank.com[tcecil@vistabank.com]; jsteinmetz@vistabank.com[jsteinmetz@vistabank.com]
From: BReagor@aol.com[BReagor@aol.com]
Sent: Thur 9/22/2016 10:46:58 AM (UTC-05:00)
Subject: Fwd: Overdrawn accounts
20160922090132544.pdf

Shane-Brad-Jarrod-

I just read the email below from Toby and I don't ever want to get an email like that again.

We have always had a great relationship with Vista Bank and we always want to have a great relationship with Vista Bank. I don't ever want Vista Bank to worry about the RDAG. We are stock holders in Vista Bank and we believe in Vista Bank! They are friends and allies of the RDAG.

My understanding is that we had an audit which required several payoffs yesterday and our accounts got overdrawn.

Let's not ever let that happen again! Let's stay on top of this daily and make sure that we are proactive to stay ahead of any potential red flags.

I don't want any red flags ever!!!!!!!!! We are doing too good to ever have any red flags! Toby please call me personally if there is ever any concern immediately!!!!!!!!!

I talked to Shane and he told me that he went to Mitsubishi this morning and got everything straightened out related to our accounts!

I called Toby and he told me he sent the email to make sure I was in the loop. Going forward we agreed to make sure that we don't ever let this situation develop again.

Shane, Brad, Jarrod- Let's get some controls in place that prevent this situation from ever developing again. We never want Vista Bank having any question about the RDAG.

Thanks you Toby and John for all you have done as partners to help me, Rick and the RDAG grow it's business!

Toby-John- If I need to do anything else please call me asap!

Thanks,

**Bart W. Reagor**
Founder and CEO
Reagor Dykes Auto Group
O: 806-776-8700
breagor@reagordykes.com

 

reagordykesautogroup.com

*We are what we repeatedly do. Excellence, then, is not an act, but a habit.—Aristotle*
*But those who trust in the LORD will find new strength. They will soar high on wings like eagles. They will run and not grow weary. They will walk and not faint.—Isaiah 40:31*
*"Strive not to be a success, but rather to be of value. —Albert Einstein"*

CONFIDENTIAL

SMTZ-VISTA-RD0000081

From: tcecil@vistabank.com
To: breagor@aol.com
Sent: 9/22/2016 9:23:07 A.M. Central Daylight Time
Subj: Overdrawn accounts

Bart,

We have a situation that we need to address quickly regarding the RD dealership accounts. I have attached the account history for the Mitsubishi account as of close of business yesterday which reflects a negative balance of $1,018,504.03. I know that y'all are in the middle of an audit but this type of activity on your accounts can not continue.

Shane has done a tremendous job of collecting deposits and keeping me abreast of all developments (including multiple phone calls and emails daily) but even with all his efforts the account still has a negative balance of close to $200K and this does not include the other overdrawn accounts.

We truly value this relationship but when a customer has multiple accounts that are at the top of the overdrawn list, it is very difficult to continue to extend credit to a customer.

Thanks

**Toby Cecil**
**President**
4621 50th Street
Lubbock, TX 79414
Telephone:806.771.9500
Fax:806.771.9709
tcecil@vistabank.com





This message is confidential and intended for the use of the addressee only. Any disclosure, use or copying of the contents by anyone other than the intended recipient is prohibited. If you received this message in error, please notify the sender immediately by return e-mail. Vista Bank has taken every reasonable precaution to ensure that any attachment to this email has been checked for viruses. We accept no liability for any damage sustained as a result of software viruses. You are advised to carry out your own virus check before opening any attachment.




Like Us On Facebook
facebook.com/SoarWithVistaBank

SMTZ-VISTA-RD0000082

# EXHIBIT "E"
**Post-Petition Deposits**

## Exhibit E

### Post Petition Transfers

| Unauthorized Post-Petition Deposits | | | |
|---|---|---|---|
| Date | Amount | Account | Transfer[4] |
| 8/6/2018 | $927.72 | RDAC Checking xxx3387 | Miscellaneous Credit<br>Rvse Payment on BL #73443 |
| 9/28/2018 | $2.33 | RDAC Savings xxx2723 | Interest Credit<br>Interest Payment |
| 8/6/2018 | $359.83 | RDAC Savings xxx2723 | Miscellaneous Credit<br>Rvse Payment on BL #73443 |
| 8/29/2018 | $5,748.74 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Reserve Disburs-DLR Trans |
| 8/20/2018 | $231.90 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/20/2018 | $168.01 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/17/2018 | $352.98 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/16/2018 | $345.28 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/14/2018 | $704.61 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/14/2018 | $655.68 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |

| | | | |
|---|---|---|---|
| 8/14/2018 | $301.57 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/14/2018 | $135.91 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/13/2018 | $1,362.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/13/2018 | $182.25 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/10/2018 | $297.97 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/10/2018 | $171.50 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/9/2018 | $351.97 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/9/2018 | $351.97 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T<br>(Reference Number 20004674) |
| 8/8/2018 | $48,134.69 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Loan Funding – DLR Trans |
| 8/8/2018 | $894.81 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/7/2018 | $21,492.26 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**102329835**<br>JTMZFREVXJJ19192 |
| 8/7/2018 | $1,665.21 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |

EXHIBIT E

| | | | |
|---|---|---|---|
| 8/6/2018 | $33,690.89 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Loan Funding – DLR Trans |
| 8/6/2018 | $3,142.49 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/3/2018 | $92,252.97 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-U.S. Bank N.A. – Lease ACH |
| 8/3/2018 | $26,683.62 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TD Auto Finance – CCC Entry |
| 8/3/2018 | $26,499.83 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-CAF - Houston – Dealers |
| 8/3/2018 | $20,402.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-AmeriCredit Fina – Loan Fundi |
| 8/3/2018 | $12,627.65 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**102047297**<br>5YFBURHE4EP02643 |
| 8/3/2018 | $6,111.12 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-SunTrust LN 656 – DLR DISB |
| 8/3/2018 | $2,991.60 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Chase – Dealer RSV |
| 8/3/2018 | $545.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/3/2018 | $451.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/3/2018 | $223.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/3/2018 | $84.01 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/2/2018 | $59,000.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>Credit Memo |
| 8/2/2018 | $51,936.84 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-MUSA Auto Finance –<br>ORGNTN600-101758 |

| 8/2/2018 | $30,106.44 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-MUSA Auto Finance –<br>ORGNTN600-101723 |
|---|---|---|---|
| 8/2/2018 | $19,627.86 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**102282473**<br>JTEBU5JR5F525133 |
| 8/2/2018 | $19,250.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Toyota-CMMRMR*I<br>V*VIN#2T3RFREV0JW8 |
| 8/2/2018 | $16,545.75 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-AmeriCredit Fina –<br>Loan Fundi |
| 8/2/2018 | $15,205.48 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Foursight – Elec – CR |
| 8/2/2018 | $6,739.24 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Lubbock National –<br>Payment NTE*July Reserve<br>Disbursement |
| 8/2/2018 | $513.28 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-Transfirst-BKCD<br>STLMT543684555779198<br>Reagor Dykes T |
| 8/2/2018 | $255.18 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/2/2018 | $155.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/1/2018 | $77,698.00 | RDT Checking xxx2788 | Returned Item<br>Returned Check<br>(Reference 36708) |
| 8/1/2018 | $59,001.00 | RDT Checking xxx2788 | Returned Item<br>Returned Check<br>(Reference 36739) |
| 8/1/2018 | $15,997.29 | RDT Checking xxx2788 | Returned Item<br>Returned Check<br>(Reference 36727) |
| 8/6/2018 | $60,772.78 | LMITSU Checking xxx3409 | Miscellaneous Credit<br>Rvse Pymt to BL #73443 |
| 9/10/2018 | $523.16 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Citi Private LBL – Payment |

| 8/29/2018 | $4,159.47 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Reserve Disburse – DLR Trans |
|---|---|---|---|
| 8/23/2018 | $30,164.33 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**101017294**<br>1FMCU0F76JUC0660 |
| 8/23/2018 | $17,758.54 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**100127738**<br>1FADP3F22JL32182 |
| 8/23/2018 | $16,552.15 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**102245661**<br>1FA6P8AM4F533781 |
| 8/22/2018 | $1,766.07 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Lynx Services<br>EDI PYMNTSISA*00* *00* |
| 8/20/2018 | $2,136.24 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Lynx Services<br>EDI PYMNTSISA*00* *00* |
| 8/20/2018 | $310.57 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/20/2018 | $301.69 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/20/2018 | $128.21 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/15/2018 | $309.13 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/14/2018 | $812.88 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/14/2018 | $287.17 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-SF Mutual<br>A08SF0001NTE*ZZZ*<br>108364240KA0808137053 |
| 8/10/2018 | $93.62 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/9/2018 | $155.08 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |

EXHIBIT E

| 8/9/2018 | $150.99 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-TransFirst – BKCD<br>STLMT543684555779200<br>Reagor Dykes T |
| 8/8/2018 | $28,755.00 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Loan Funding – DLR Trans |
| 8/7/2018 | $27,352.80 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Santander Consum-Direct Pay<br>**102412012**<br>2FMPK3G93JBC2312 |
| 8/7/2018 | $6,205.89 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-TransFirst – BKCD<br>STLMT543684555779200<br>Reagor Dykes F |
| 8/7/2018 | $823.96 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Citi Private LBL – Payment |
| 8/7/2018 | $365.22 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Flagship ACC – Credits |
| 8/6/2018 | $43,911.84 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Ford Motor Co – USNASA CRT |
| 8/6/2018 | $3,968.77 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-TSYS-TransFirst – BKCD<br>STLMT543684555779200<br>Reagor Dykes F |
| 8/3/2018 | $50,203.26 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-TD Auto Finance – CCC Entry |
| 8/3/2018 | $32,000.00 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-USAA Auto Loan Payment<br>VIN 5LMJJ2JT0HEL00425 |
| 8/3/2018 | $5,078.60 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-SunTrust LN 656 – DLR DISB |
| 8/3/2018 | $4,763.52 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Chase – Dealer RSV |
| 8/3/2018 | $1,448.39 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-TSYS-TransFirst – BKCD<br>STLMT543684555779200<br>Reagor Dykes F |
| 8/3/2018 | $1,298.42 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-BB&T – BBT RESRV |

**EXHIBIT E**

| 8/3/2018 | $629.99 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-FORD CREDIT – DEFTCREDIT |
|---|---|---|---|
| 8/2/2018 | $67,345.99 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-U.S. Bank – Dealer FND |
| 8/2/2018 | $36,918.84 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-TD Auto Finance – CCC Entry |
| 8/2/2018 | $24,343.97 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-Loan Funding – DLR Trans |
| 8/2/2018 | $11,000.28 | RDAC Checking xxx6693 | Miscellaneous Credit<br>Credit Memo |
| 8/2/2018 | $2,426.49 | RDAC Checking xxx6693 | Miscellaneous Credit<br>AC-TSYS-TransFirst – BKCD<br>STLMT543684555779200<br>Reagor Dykes F |
| 8/2/2018 | $293.55 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/2/2018 | $247.97 | RDT Checking xxx2788 | Miscellaneous Credit<br>AC-Zurich American-Payments |
| 8/1/2018 | $67,769.00 | RDT Checking xxx2788 | RETURNED ITEM<br>RETURNED CHECK<br>(Reference 70614) |
| 8/1/2018 | $59,930.00 | RDT Checking xxx2788 | RETURNED ITEM<br>RETURNED CHECK<br>(Reference 70667) |
| 9/28/2018 | $0.64 | RDT Savings xxx6842 | Interest Credit<br>Interest Payment |
| 8/6/2018 | $5,364.49 | RDT Savings xxx6842 | Miscellaneous Credit<br>Rvse Pymt on BL #73443 |
| 9/28/2018 | $2.27 | LMITSU Savings xxx9343 | Interest Credit<br>Interest Payment |
| 8/6/2018 | $19,027.36 | LMITSU Savings xxx9343 | Miscellaneous Credit<br>Rvse Pymt on BL #73443 |
| **TOTAL** | **$1,320,434.32** | | |